[No. H034424. Sixth Dist. Nov. 24, 2010.]

CITY OF SAN JOSE, Plaintiff and Respondent, v.
WILLIAM GARBETT, Defendant and Appellant.

**COUNSEL**

Cindy A. Diamond for Defendant and Appellant.

Richard Doyle, City Attorney, Nora Frimann, Assistant City Attorney, and Margo Laskowska, Deputy City Attorney, for Plaintiff and Respondent.

**OPINION**

**ELIA, J.**—Appellant William Garbett seeks review of multiple injunctions granted to the City of San Jose (City) pursuant to Code of Civil Procedure section 527.8.[1] Appellant contends that the orders, which restricted his

[1] All further statutory references are to the Code of Civil Procedure except as otherwise indicated.

conduct toward the mayor and city council, violated his constitutional rights to free speech, were not supported by sufficient evidence that he had made a credible threat, and were overbroad. We find no error and therefore will affirm the orders.

## Background

Appellant describes himself as a "civic-minded gentleman with a penchant for following city government." His civic-mindedness brought him to city hall in San Jose numerous times over many years. He was well known there; he attended city council meetings almost every week, election meetings, and "rules in open government committee" meetings. At city hall meetings he regularly spoke during the "public comment" period, "always with reference to something negative impacting him or the City or that he's just not in agreement with."

### Encounters with Pimentel

Nora Pimentel, a deputy city clerk, was familiar with appellant, as he not only had attended meetings at city hall, but had come to the city clerk's office with questions or requests for public records. Pimentel found appellant to be angry and resentful toward the City. At meetings he tended to clench his jaw, become very stiff, and speak in a "somewhat condescending way."

On February 11, 2008, Pimentel was "shadowing" the city clerk as part of her training in the election process. Appellant came in to obtain nomination papers so that he could run for a seat on the city council. He was angry that in the past he had encountered obstacles to his attempts to run for this position, but the city clerk promised to help him.

Appellant returned on March 5, 2008, and asked to speak to Pimentel. Pimentel took appellant into a conference room, where he gave her his nomination paper. Pimentel noted that it had only one signature on it rather than the required 50-person minimum, which disqualified appellant from candidacy. Appellant explained that he did not want to "make a big deal" about it; this was "his way of bowing out gracefully." Pimentel expressed her appreciation for his restraint, thanked him for his interest in running for office, and wished him better luck next time.

Appellant then began telling Pimentel that the police were "in and out of his home," had "ransacked" it, and had landed a helicopter on his roof; that the director of environmental services had rummaged through his garbage on occasion; and that the City had caused his neighbor's house to burn down. While talking about these perceived events, appellant appeared irritated; he maintained an erect posture and a clenched jaw and kept his hands together. Appellant believed that the director of environmental services and everybody connected with the City were "just against him and bullying him into not running for the [district 10] seat."

On May 28, 2008, appellant appeared at the front desk of the city clerk's office and asked if his signature had qualified. Pimentel reminded him about their conversation in March, in which they had discussed the disqualification caused by the one signature and appellant had acknowledged his withdrawal. After a few times, Pimentel's explanation seemed to convince appellant and he did not persist with this topic. Then, however, he went on to complain that in the 40 years he had lived in San Jose the City had been against him. He stated that he was given only one minute to speak at city council meetings. Pimentel corrected appellant, reminding him that he was always allowed two minutes, the time given to all those who wanted to speak during the public comment period of each meeting.

Pimentel suggested to appellant that if he had additional issues and concerns he could put them in writing and submit them through the public record. Appellant "got a little upset" and said that "[n]othing ever makes it to the public record" because it "gets blown up before it gets there." Pimentel again corrected appellant, insisting that every piece of correspondence addressed to the mayor, council, clerk, or city manager was entered in the public record.

At this point appellant was "getting a little agitated" with Pimentel. He was "very stiff, very rigid," and he raised his voice while speaking in an "arrogant, condescending way." He was "clearly upset." Three of Pimentel's coworkers came over to ask if everything was all right; one of them repeatedly reminded Pimentel that she had a meeting to attend. At one point appellant said, "What does somebody have to do to change policy around here? Do you have to be—take matters into your own hands like the Black man in Missouri?" He had stopped yelling and his voice was monotone and cold, his jaw clenched.

When he made that statement Pimentel felt angry, and she felt threatened. She "locked eyes" with appellant and said, "Are you threatening us, Mr. Garbett?" Appellant "just got all rigid and . . . clenched his jaw and said, No." Pimentel told him that the conversation was over; she would talk with him another time, but she needed to get to a meeting.

Pimentel understood that appellant was referring to events on February 8, 2008, when an angry man in a Missouri city shot several people at city hall, killing five of them. While describing this incident at trial, Pimentel was crying and shaking, holding her hands together.

Pimentel reported the event to the assistant city clerk and to Officer Daniel Anderson, who was filling in for the mayor's bodyguard. She was concerned that appellant might go to the "rules in open government" committee meeting, and she wanted the committee members to know what he had said. Pimentel feared for the future safety of herself, the mayor, the city council, the staff, and the city clerk's office, even the City as a whole.

Pimentel saw appellant again on June 11, 2008, while she was alone in a conference room, setting up for a rules committee meeting. Appellant entered and said "hi" to her, and she felt uneasy and fearful. By the time of trial she believed she was even more afraid of appellant, because he might have added her "to his list of people against him." Pimentel began to cry as she related this fear, which she expressed for the city council as well as herself.

Michelle Radcliffe, another deputy city clerk, was at the front desk when appellant came in to ask if his nomination papers had qualified him for candidacy. She was standing right behind appellant when he said to Pimentel, "What do I need . . . to do to get things done around here? Do I need to take matters into my own hands like that Black man did in Missouri?" Radcliffe supplied additional detail to this interaction. When Pimentel asked him if he was making a threat, appellant answered, "No, I'm not. But is that what I need to do to take matters into my own hands?" According to Radcliffe, appellant was visibly upset and angry. His jaw was clenched and tight and his tone was assertive and loud enough to be heard by anyone nearby. Pimentel, too, appeared very upset. Standing behind appellant, Radcliffe nonverbally offered to call security, and Pimentel nodded. Radcliffe was scared. She cried as she testified.

The mayor's usual bodyguard was Ted Trujillo. Over the two and a half years he had known appellant, he had seen him become angrier and more

agitated with the mayor and the city council. Trujillo was absent from work on May 28, 2008, but when he returned in early June he spoke to appellant. Appellant told Trujillo that he had not made a threat. He said that "he was familiar with the Black guy out of Kirkwood, Missouri." Trujillo explained the reference: Charles Thornton had killed six people and injured two others at a Kirkwood City Council meeting on February 7, 2008, less than four months earlier. Thornton, too, had had long-standing grievances with the city. He had run for city council, had verbally assaulted different members of the city council, and had done things at the podium that brought "a great amount of attention to himself."

Appellant described Charles Thornton to Trujillo as "a good friend of his." Speaking in a calm and matter-of-fact manner, appellant claimed to have spoken to Thornton a month before that shooting. He said there was a conspiracy at city hall and the clerk's office to prevent him from being a city council candidate. Listening to appellant, Trujillo was "extremely fearful" for the mayor and the council.

On June 10, 2008, Trujillo intercepted appellant as he was trying to enter the city council chambers and told appellant he would need to be searched. Appellant became angry, upset, and uncooperative. Appellant left, but he returned 15 to 30 minutes later. He was calmer this time and agreed to be searched as long as it was in front of people entering the chambers. At trial Trujillo testified that he was "absolutely" fearful for the safety of the mayor, the members of the city council, and Pimentel. Extra monitoring procedures were implemented when appellant was in the presence of the mayor and city council, including additional security, uniformed officers, civilian security staff, and people positioned close to him when he was speaking at the podium.

*The Petitions*

On August 5, 2008, the City filed 12 petitions under section 527.8, each seeking an injunction prohibiting violence or threat of violence by appellant against Pimentel, the mayor, and 10 city council members. Also sought were temporary restraining orders, which the superior court issued on August 18, 2008. In his response to the petitions, appellant claimed that his acts were constitutionally protected by his First Amendment right of free speech. His conduct, he asserted, did not constitute violence or a credible threat of violence and therefore did not meet the conditions for an injunction.

The hearing on the petitions did not begin until January 30, 2009. In the course of the proceedings the City filed two additional petitions to protect two newly elected members of the city council.

*Trial Evidence*

At the hearing the City presented several witnesses who had had previous interactions with appellant. San Jose Police Officer Colin Crooker recalled being in uniform at a civil standby in which appellant refused to identify himself and became "enraged." Appellant "was jumping up and down, waving his arms, clenching his fists, [and] making irrational statements, saying 'it's all a conspiracy. You're against me.' " At this point Officer Crooker began to fear for his own safety and that of the other officer present. At one point, when Officer Crooker urged appellant to calm down, appellant became even more enraged. Flailing his arms about, appellant lunged at the officer, grabbing his shoulders "in a violent way." The officer was afraid when appellant attacked him, and he took appellant into custody.

Alicia Johnson worked with the mayor and City departments to ensure that meetings went smoothly. She related a city council meeting in February of 2007 in which appellant used his turn to speak by forcefully placing a "very filthy" bucket on the podium, causing a mess that required an interruption of the proceedings to clean it up. In an angry, intense, "disgruntled" manner, appellant spoke about "the blight of San Jose" and stated that the bucket contained water, termite dust, and "household-eating mold," debris that had come through the holes in his roof when police helicopters landed on his roof. Johnson had heard appellant refer to the helicopter intrusion five or six times during city council meetings. She felt vulnerable and afraid on this occasion, because no one had any idea what was in the bucket, the contents of which had flown "everywhere" in the council chambers.

Mark Brogan, a financial analyst who had worked in utility billing services, had had between 15 and 20 encounters with appellant between 2002 and 2007. Appellant had appeared at administrative hearings to complain about the City not providing garbage, recycling, and streetsweeping service. He also would talk about the police helicopters that had "shot into his house" and landed on his roof, causing the TV antenna to penetrate the roof and pierce his back. He insisted that the police and mayor were "out to get him." He believed that the police would put a barricade around his property so that the garbage could not be picked up, and they had gone into his house and raped his daughter. Appellant would often use profanities and become "aggressive" with his hand gestures, pointing his finger, waving his hand, and banging his fists on the table in front of Brogan. On one occasion he told Brogan that he had a six-foot plot picked out for Brogan in his back garden. Brogan was afraid. Appellant mentioned the names Jeffrey Dahmer, Theodore Kaczynski, and Timothy McVeigh.

While working in the finance department of utility billing services, Judith Boes also became familiar with appellant. Twice a month between 1993 and

1996 he came in to complain about the garbage program and the lien process to which he had repeatedly been subjected. Appellant was angry that he did not use the garbage service but still had to pay for it. Between 1993 and 1996, when she left the department, appellant came in almost every week and caused a disturbance in the lobby. He yelled at the staff and "would go on and on" about military ordnance and explosives. At one point he said, "May the garbage wars begin," and he said he was not afraid to die.

Yvonne Abougudom was a parking control traffic officer who had an encounter with appellant in September 2007. While inspecting two vehicles that appeared to have been parked for a long time, she was about to put an impound warning notice on them when appellant approached and asked her what she was doing. When Abougudom explained, he accused her of being there to bother him. He said the police "were out to get him" because they did not want him in the City. He told her that "[t]hey land on my roof every night. And they're trying to kill me." He specifically mentioned a particular officer who wanted to kill him and complained that the mayor was preventing him from attending meetings and voting. During the encounter appellant was combative, "very, very frustrated" and angry, and "kind of explosive at times." He was "like a time bomb." Following procedure, Abougudom marked the tires on appellant's car. Appellant responded by writing "pig" in ink on the driver's door of her City vehicle. Although he did not directly threaten Abougudom or anyone at the city clerk's office or city council, she nonetheless felt threatened and called for a police officer "roll-by."

Three days after Abougudom's warning notice, another parking control officer, Tracy Keifer, followed up on the vehicle. Seeing no chalk marks on the tires, she began marking them when appellant ran up behind her and began shouting angrily at her. Keifer warned him to back off, but appellant continued yelling at her. He said he had had Abougudom arrested after her recent visit, and he told Keifer that she was vandalizing and "graffitiing" his vehicle. He told her that the San Jose police department was already after him, and that police helicopters had crashed into his roof twice. Two different officers had frequently come to his house and had broken his windows, because he knew that they were murderers. He reported that the former mayor had fathered his own grandchildren and had murdered his first wife. Although appellant did not express any direct threats, Keifer felt threatened during the 30-minute encounter, and she still felt threatened by the time of trial.

Officer Timothy Gall conducted a traffic stop of appellant in 1995. Appellant refused to produce his driver's license, and when the officer stepped forward to arrest him, appellant struck the officer in the chest with clenched fingers, like "a martial arts palm strike." In the patrol car after being

arrested, appellant was belligerent, using profanity and saying that the mayor and police were out to get him. Officer Gall considered placing appellant on a 72-hour hold, but finally determined that because he was restrained, appellant did not pose a danger to himself or others.

The hearing concluded on May 4, 2009, when 14 identical injunctions were issued. Each included a stay-away order, with specified exceptions to allow appellant to attend public city council meetings.[2] Appellant filed a timely notice of appeal.

## Discussion

### 1. *Section 527.8 and Free Speech*

Section 527.8, the Workplace Violence Safety Act, enables an employer to seek an injunction to prevent violence or threatened violence against its employees. The statute provides, in relevant part: "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer." (§ 527.8, subd. (a).)

Appellant points to subdivision (c) of section 527.8, which cautions that the statute "does not permit a court to issue a temporary restraining order or injunction prohibiting speech or other activities that are constitutionally protected, or otherwise protected by Section 527.3 or any other provision of law." In this case, he argues, the injunction violated his rights to free speech and petition under the First Amendment to the United States Constitution and article 1, sections 2 and 3, of the California Constitution.[3]

■ The First Amendment does not help appellant here. The right to free speech is not absolute or unlimited. (*Near v. Minnesota* (1931) 283 U.S. 697, 708 [75 L.Ed. 1357, 51 S.Ct. 625]; *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 486 [101 Cal.Rptr.2d 470, 12 P.3d 720].) As our Supreme Court has explained, " '[T]he state may penalize threats, even those consisting of

---

[2] Other than for meetings, appellant was to stay 300 yards from the protected individuals and from city hall. Appellant was to enter city hall through specified entrances and be subject to search before entering the city council chambers. During the meetings he was to sit in a specific row and use a particular stairway. He also was not to file any document personally with the city clerk, but was required to mail it or have someone else deliver it for him.

[3] For convenience we will adopt appellant's abbreviation of these constitutional citations as First Amendment references.

pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, " 'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . .' " [Citations.]' . . . A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity. [Citation.]" (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134 [87 Cal.Rptr.2d 132, 980 P.2d 846] (*Aguilar*), quoting *In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365].) "As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. [Citation.]" (*In re M.S., supra,* 10 Cal.4th at p. 710.) "[O]nce a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited 'prior restraint' of speech." (*Aguilar, supra,* 21 Cal.4th at p. 140; see also *USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 445–446 [4 Cal.Rptr.3d 54].)

■ Thus, it is clear that if the elements of section 527.8 are met by the expression of a credible threat of violence toward an employee, then that speech is not constitutionally protected and an injunction is appropriate. The relevant question for this court is whether the City proved the elements of the statute. If so, reliance on the First Amendment will be unavailing.[4]

### 2. *Substantial Evidence*

#### a. *Credible Threat*

■ Appellant contends that there was insufficient evidence that he made a credible threat to Pimentel or any other City employees. A "credible threat of violence" under section 527.8 is "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.8, subd. (b)(2).) "[T]o obtain a permanent injunction under section 527.8, subdivision (f), a plaintiff must establish by clear and convincing evidence not only that a defendant engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result to an employee if a prohibitory injunction were not

---

[4] Appellant does not challenge the constitutionality of the statute itself.

issued due to the reasonable probability unlawful violence will occur in the future." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 335 [85 Cal.Rptr.2d 86].) On appeal, however, we review an injunction issued under section 527.8 to determine whether the necessary factual findings are supported by substantial evidence. (*USS-Posco Industries v. Edwards, supra*, 111 Cal.App.4th at p. 444.) Accordingly, we resolve all factual conflicts and questions of credibility in favor of the prevailing party, and draw all reasonable inferences in support of the trial court's findings. (*Ibid.*)

Appellant argues that the findings of the trial court cannot be upheld because it "did not make a factual finding on the element of willfulness. . . . At no time did the court examine, factually, whether the statement was intended to be taken as a threat." Had the court undertaken this analysis, appellant believes, the injunction would not have been issued, because the evidence "proved that appellant specifically did not intend his statement to Pimentel to be a threat." He points to the following circumstances to support his factual challenge: The statement was "a rhetorical question, with no inclusion of specifics"; he did not suggest that consequences would follow if his "desires were not met" or otherwise attempt to coerce Pimentel; he is "known to be bombastic, to speak in grand language, and to use rhetorical flourishes," having used "graphic, loud, attention-grabbing speech" in city hall for 20 years; he answered "No" when Pimentel asked if he was threatening the city hall personnel; and no threatening· behavior or language followed this incident.

The trial court looked to the testimony of Nora Pimentel and expressly determined that "she was clearly shaken" by appellant's reference to Charles Thornton in this context, and that "a reasonable person would have felt threatened by [appellant's] statement." Appellant, however, believes that the court went astray in placing weight on Pimentel's reaction. In his view, it makes no difference that Pimentel's fear was honest or reasonable, because he never made any statement "with the intention for it to be taken as a threat." Indeed, appellant spends considerable energy attempting to show that his statement was not a "true threat." He maintains that his rhetorical comparison of himself to Charles Thornton was not a "true threat," but at worst was only an ambiguous expression, which must be analyzed by examining whether he had the specific intent that it be taken as a threat. Such an examination, he maintains, must take into account his clear statement that he did not *intend* to threaten anyone.

■ We agree with the City, however, that appellant's subjective intent was not required for his conduct to be deemed a credible threat. The present definition of "credible threat" in section 527.8 is the product of a 1998 amendment, which deleted the language of intent. Before the amendment,

subdivision (b)(2) of the statute read: " 'Credible threat of violence' is a knowing and willful statement or course of conduct which would cause a reasonable person to believe that he or she is under threat of death or serious bodily injury, and *which is intended to, and which actually causes, a person to believe that he or she is under threat of death or serious bodily injury*, and which serves no legitimate purpose." (Italics added.) By eliminating the italicized (and awkwardly phrased) language, the Legislature unequivocally dispensed with the requirement that the defendant intend to cause the person to believe that he or she had been threatened with death or serious injury. It currently requires only a statement made knowingly and willfully, which would place a reasonable person in fear for his or her safety. (Cf. *Kern County Water Agency v. Belridge Water Storage Dist.* (1993) 18 Cal.App.4th 77, 86 [22 Cal.Rptr.2d 354] ▇ ["When a statute is amended to delete an express provision, the presumption is that the Legislature intended to change the law."]; *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231 [273 P.2d 5] [same].)

▇ Appellant's analysis and the cases he cites do not help him. "A true threat occurs when a reasonable person would foresee that the threat would be interpreted as a serious expression of intention to inflict bodily harm." (*In re Steven S.* (1994) 25 Cal.App.4th 598, 607 [31 Cal.Rptr.2d 644].) Contrary to appellant's assumption, whether the threat is conveyed by conduct or pure speech is irrelevant. In any event, as discussed above, the statute applicable in this case does not contain the element of specific intent to convey a threat to the affected person. The willfulness requirement addressed in *In re M.S., supra,* 10 Cal.4th at page 713, on which appellant relies, applied directly to the threat,[5] whereas here only the statement must be made willfully, regardless of the intent behind it. Also distinguishable is *People v. Carron* (1995) 37 Cal.App.4th 1230 [44 Cal.Rptr.2d 328], where the statute under scrutiny, Penal Code section 646.9, expressly contained specific intent elements.

Appellant's assertion that the United States Supreme Court requires an intent that a statement "be received as a threat" is unconvincing in the circumstances presented here. *Virginia v. Black* (2003) 538 U.S. 343, 348 [155 L.Ed.2d 535, 123 S.Ct. 1536], for example, involved a statute prohibiting cross burning " 'with the intent of intimidating any person or group of persons.' "[6] (Va. Code, § 18.2-423.)

---

[5] The opinion in *In re M.S.* examined Penal Code section 422.6, subdivision (a), which describes various forms of hate crimes, including "willfully" threatening a person. The court interpreted the statutory language to include a specific intent to interfere with the other person's legally protected rights. (*In re M.S., supra,* 10 Cal.4th at p. 713.)

[6] The high court upheld this statute except for the unconstitutional portion that allowed cross burning alone to be " 'prima facie evidence of an intent to intimidate a person or group of

■ More apposite is *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228 [29 Cal.Rptr.3d 521] (*Huntingdon*). There the Fourth District, Division One, found that publications on a Web site constituted credible threats of violence within the meaning of both sections 527.6, subdivision (b)(2) and 527.8, subdivision (b)(2). Examining section 527.6, the harassment statute, the court stated, " 'It is not necessary that the defendant intend to, or be able to carry out his threat; the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat.' " (129 Cal.App.4th at p. 1256.) The court further observed that while Huntingdon Life Sciences, Inc., had no standing under section 527.6, it could seek relief for its employees under section 527.8. Because those two statutes were intended to provide the same relief, the same reasoning applied to both. Accordingly, the court held that Huntingdon Life Sciences, Inc., had demonstrated a probability of prevailing under not only section 527.6 but also section 527.8, thereby defeating the defendants' section 425.16 (anti-SLAPP (strategic lawsuit against public participation)) motion. (129 Cal.App.4th at pp. 1258–1259.)

In reaching its conclusion the *Huntingdon* court quoted a portion of an analogous case, *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists* (9th Cir. 2002) 290 F.3d 1058. There the appellate court distinguished the statute before it in light of a challenge similar to appellant's: The defendants argued that a "subjective intent component of 18 U.S.C. section 248 required 'evidence, albeit circumstantial or inferential in many cases, that the speaker actually intended to induce fear, intimidation, or terror; namely, that the speaker intended to threaten. If a person did not intend to threaten or intimidate (i.e., did not intend that his or her statement be understood as a threat), then the speech should not be considered to be a "true threat," unprotected by the First Amendment.' " (See *id.* at pp. 1075–1076.) The court instead adopted the "reasonable speaker" test: " 'Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.' " (*Id.* at p. 1074; see also *Franklin v. The Monadnock Co.* (2007) 151 Cal.App.4th 252, 259–260 [59 Cal.Rptr.3d 692] [defining "credible threat" under § 527.8 as "one that an employee reasonably believes will be carried out, so as to cause the employee to fear for his or her safety or that of his or her family"].)

Also noteworthy is *USS-Posco Industries v. Edwards, supra,* 111 Cal.App.4th 436. The defendant in that case invoked a similar defense: He

persons.' " (*Virginia v. Black, supra,* 538 U.S. at p. 348.) That provision blurred the line between protected and unprotected speech and thus ran afoul of the First Amendment.

"claimed he had not meant anything by his comments in the office, had not directed them to anyone in particular, and had only been joking." (*Id.* at p. 441.) After an injunction was issued, he sought modification, declaring "that he had no history of violent conduct, and . . . that while he was well known as a 'trash talker' he never took action and should not be taken seriously." (*Ibid.*) The trial court rejected that defense and the First District affirmed.

■ Thus, based on the plain language of the statute before us and the reasoning of both analogous cases and those involving intent-based statutes, the trial court properly found that appellant had uttered a credible threat within the meaning of section 527.8. In its order the court clearly articulated the factual and legal basis of its conclusion, repeatedly acknowledging the importance of the factual context in deciding whether the test for a credible threat had been met and the likelihood of irreparable harm. As appellant's statement caused Pimentel and others to have a reasonable fear that appellant would harm City employees, the injunction was properly issued.

b. *Pimentel's Fear*

Appellant briefly asserts that insufficient evidence supported the finding that Pimentel "was in fear as a result of appellant's question to her." He questions her credibility by suggesting that she "did not act consistently with being in fear," because (a) she "did nothing more" after reporting it to authorities; (b) although "the act of testifying about her encounter with appellant was apparently traumatic," she also admitted that his comment made her angry, which "indicates her true feelings about appellant's rhetoric"; and (c) had she "truly been fearful, she could and would have sought a personal restraining order." Appellant's challenge ignores the standard of appellate review. It was for the trial court as fact finder to determine the credibility of Pimentel's testimony, including her explicit statement that she was afraid when appellant suggested that his only recourse was to take action like Charles Thornton in Missouri. In addition, Pimentel testified that she was afraid for the safety of the mayor and city council members as well as for her own. Substantial evidence clearly supported the trial court's finding that Pimentel experienced fear when appellant made his threat.

Relying on *In re George T.* (2004) 33 Cal.4th 620 [16 Cal.Rptr.3d 61, 93 P.3d 1007], appellant urges this court to reject Pimentel's perception of his ambiguous statements as a threat and instead to interpret them independently as nonthreatening. *George T.*, however, is not determinative of the outcome here. Our Supreme Court in that case was examining the nature of a student's poem, which the juvenile court had regarded as a criminal threat under Penal Code section 422. While emphasizing the importance of independent review

in the threats context, the high court examined not only the words of the poem but also circumstances surrounding its submission. The court observed that there was no history of animosity or conflict between the minor and the students receiving the poem, no threatening gestures or mannerisms accompanying the poem, and no conduct unequivocally indicating an immediate prospect that any threat would be carried out. (33 Cal.4th at p. 636.)

Here we are not examining an inherently ambiguous medium of artistic expression, and we cannot ignore the history of animosity from appellant toward City officials. In the circumstances presented here, appellant's statements met the prerequisites for an injunction under section 527.8, including the statutory element of a "credible threat of violence."

### c. *Future harm*

Appellant finally challenges the sufficiency of the evidence that there was a likelihood of future harm. He points out that he "did not repeat any alarming conduct or make any threatening statement . . . to anyone" after the statement to Pimentel. As interpreted by the court in *Scripps Health v. Marin, supra,* 72 Cal.App.4th 324, section 527.8, subdivision (f), requires a finding of clear and convincing evidence "not only that a defendant engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability [that] unlawful violence will occur in the future." (*Scripps Health,* at p. 335.) Appellant compares his case to that of Marin, the *Scripps* defendant, because neither repeated his offending conduct. But the facts are not comparable. The injunction in *Scripps* arose from a tension-filled meeting between a hospital administrator and a patient's son. When the administrator insisted that they needed to discuss Marin's mother and stood in front of the door, blocking his exit from the meeting room, Marin pulled the door open, which hit the administrator and pushed her into the wall. After this single act of violence Marin agreed to stay away from the hospital, and his mother transferred her health insurance and thus was unlikely to return to the facility where her son's violent act occurred. Based on these facts, the appellate court found insufficient evidence that Marin would repeat any violent conduct against Scripps staff. (See also *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 400–404 [5 Cal.Rptr.3d 137] [applying reasoning of *Scripps* to require probability of future harm for injunctions under § 527.6].)

■ Appellant, by contrast, continued to appear regularly at City Hall; and unlike Marin, he had a history of threatening conduct toward City employees. " '[C]ontext is critical in a true threats case and history can give meaning to the medium.' " (*Huntingdon, supra,* 129 Cal.App.4th at p. 1250, quoting

*Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists, supra,* 290 F.3d at p. 1078.) The court did not err in concluding, based on all the facts presented at trial, that irreparable harm was reasonably likely to occur if the injunction were not issued.

## 3. *Expert Evidence*

The trial court admitted the expert testimony of Christine Zarate, a police officer trained in threat assessment, and Gregory Sancier, Ph.D., a clinical psychologist and police officer working as a hostage negotiator in the crisis management unit.

Appellant contends that the court erred by admitting Zarate's testimony. He emphasizes that Zarate "was unable to offer an opinion that appellant was likely to commit violence, or was going to continually threaten anyone at City Hall. The most the expert could say is that appellant was on the 'pathway to violence,' and that the expert's 'threat assessment' training did not enable her to predict whether he would be violent in the future." Zarate's testimony and the character evidence that supported her opinion "did nothing more than establish [that] appellant had a history of flamboyant speech and dramatic behavior in communicating with the city." Appellant asserts that the factors used to predict conduct did not indicate in this case that appellant "presents a likelihood of committing violent acts or credible threats of violence in the future. . . . Thus, the expert evidence and evidence of other behavior by appellant could not form the basis of a finding that appellant was likely to be harmful in the future if the injunction did not issue."

Though portrayed as challenge to the admissibility of Zarate's opinion, appellant's argument reads more like a challenge to the *sufficiency* of the evidence she supplied in her testimony.[7] We find the evidence sufficient, however. Zarate reviewed police reports and interviewed many individuals who had had encounters with appellant, including Nora Pimentel, Officer Crooker, Alicia Johnson, Yvonne Abougudom, Judith Boes, Tracy Keifer, Timothy Gall, Mark Brogan, and Ted Trujillo. She also spoke with neighbors and family members of appellant. She tried to speak with appellant himself, but he "closed the door in [her] face." Zarate performed research on the

---

[7] In his opening brief appellant did not assert any abuse of discretion in the admission of the expert testimony, nor a failure to follow Evidence Code section 803 or section 1101. In his reply brief appellant devotes more attention to the admission of the prior-acts evidence, citing Evidence Code section 1101 and mentioning Sancier's testimony as well as Zarate's. These arguments are presented too late to be considered on appeal. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 [43 Cal.Rptr.3d 148].)

events of the Kirkwood, Missouri shooting[8] and events involving Timothy McVeigh, Jeffrey Dahmer, and Theodore Kaczynski, because he had made references to these individuals in his interactions with City employees, and identifying with mass murderers was a "high risk" factor in a threat assessment. Other risk factors included being "fixated" on city officials, "[a]pproaching a public official in an inappropriate manner," refusing to be searched, asserting that the police and other city officials were "out to get him," and being isolated in the community.

Zarate testified that "the best predictor of future violence is past violence." She acknowledged that it was not possible to "predict for sure [that] a violent act is going to happen"; one could only determine whether the person is "on the pathway to violence." This concession did not discredit the witness's testimony; it was a tempering factor that only highlighted the obvious fact that human behavior cannot be predicted with absolute certainty. The trial judge could and unquestionably did consider this limitation in evaluating the strength of the evidence before her. She did not permit testimony about the ultimate fact of appellant's future dangerousness; she repeatedly stated that whether a threat of future harm existed was for the court to decide as the trier of fact. The trial judge carefully weighed the expert's testimony together with the facts in evidence and reached her conclusion that appellant posed a risk of future harm if she did not issue the injunction. Substantial evidence supports this finding, and no evidentiary error is shown.

### 4. Overbreadth

Appellant finally asserts that there was insufficient proof that the protected individuals were employees of the City. In apparent recognition of the futility of this claim in light of the hearing testimony and the rules governing judicial notice, appellant does not support the assertion with any references to the record, including any objection on this ground. Instead, he raises a more specific issue, whether the injunction improperly encompassed two *former* members of the city council. Appellant called the court's attention to the status of these individuals at the outset of the hearing, noting that Forrest Williams and David Cortese were no longer on the council. The court deferred the question until the end of trial, but the matter does not appear to have been discussed again. No evidence or argument was presented on the

---

[8] Zarate noted that both appellant and Charles Thornton "had very long histories of grievances with the city going back years. They both had claims against the city. They both had interest in running for city council unsuccessfully. They both owed money to the city. They both had [had] outbursts, uncontrollable outbursts in city council chambers. They both had inappropriate comments made to public officials." The salient difference Zarate identified between the two was that in Kirkwood officials considered seeking a restraining order and decided against it, shortly before Thornton committed the crimes.

City employment status of Williams and Cortese. Having abandoned this claim at trial, appellant is foreclosed from raising it on appeal.

The primary focus of appellant's overbreadth argument is on the extent of the conduct prohibited by the injunctions. Because there was no claim that he inflicted violence on any City official or planned to attack city hall, "the trial court's power was only to enjoin appellant from making comments about other people's newsworthy violent actions against local government while speaking to respondent's employees." Appellant takes issue with the limitations on his access to the city hall building and his movements within the council chambers. These restrictions "were overbroad, for they did more than curtail future conduct of the nature that prompted the injunction under the workplace-safety statute." As a result, at his age of 70 he is burdened by having to use stairs instead of an elevator, by not being allowed to deliver documents personally, and by being barred from other public meetings.

Appellant's view of the scope of the permissible remedy under section 527.8 is too narrow. The content of a threat does not define the scope of the injunction; it offers a ground from which future violence may be anticipated. Consequently, threatening violence does not lead to an injunction against only a similar threat; the aim of the order is to prevent harm of the nature suggested by the threat.

It is true, as appellant points out, that "an injunction should not be granted as punishment for past acts where it is unlikely that they will recur." (*Choice-in-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422 [21 Cal.Rptr.2d 303]; accord, *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 320 [93 Cal.Rptr.3d 559, 207 P.3d 20]; *Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1040 [34 Cal.Rptr.2d 108].) In appellant's view, the restrictions on him represent the City's attempt merely to "curtail what amounts to annoying behavior." This portrayal of the facts, however, turns upon a view of the evidence not shared by the trial court. The court evidently did not agree that appellant expressed only "colorful language and fanciful ideas" that did not pose a risk. As we have already discussed, substantial evidence supports the court's factual findings on the requisite elements of section 527.8. It carefully reviewed the testimony of the witnesses who described their fearful reactions to appellant's verbal and physical outbursts and explained that in light of appellant's long-standing hostility toward City employees, accentuated by his persistent belief that the police had invaded his home and damaged his roof with their helicopter, appellant's antagonism could escalate into violent conduct. Accordingly, we must uphold its determination, by clear and convincing evidence, that an injunction was necessary to prevent irreparable harm to the identified City employees.

*Disposition*

The orders are affirmed.

Rushing, P. J., and Premo, J., concurred.