Filed 9/7/22  Morris v. Virginia A. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRANDON SCOTT MORRIS, | |
| Appellant, | G060068 |
| v. | (Super. Ct. No. 30-2020-01122012) |
| VIRGINIA A., et al., | O P I N I O N |
| Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Glenn Mondo, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.  Motion to augment record on appeal.  Denied.

Merritt L. McKeon; Law Offices of J. Christian Conrad and Jon Christian Conrad for Appellant.

Eric A. and Virginia A., in pro. per., for Respondents.

After homeowners Virginia A. and Eric A. (the As)[1] terminated a home repair contract with Brandon Morris, Morris began demanding payment from the As through what the trial court described as "over-the-top texts." The trial court found these texts constituted harassment under Code of Civil Procedure section 527.6 (section 527.6), and issued a civil harassment restraining order protecting the As from Morris. Morris appealed; we reject each of the issues he raises and affirm the civil harassment restraining order.

First, the trial court did not err by refusing to continue the evidentiary hearing due to the absence of Morris's counsel, as more than one year had passed since the request for the order was filed, and the trial court found counsel's absence was a delaying tactic.

Second, the trial court did not err by admitting portions of the hearsay declaration of an individual who worked with Morris at the As's home. The court's ruling was consistent with well-established law.

Third and finally, Morris did not have a defense to the harassment claim based on his alleged good faith or his right to free speech in pursuing money he claimed was owed to him.


STATEMENT OF FACTS AND PROCEDURAL HISTORY

In December 2019, the As hired Morris to perform remodeling work on their home. At the time, Morris advised the As he was not a licensed contractor. Morris began the job on December 26, 2019. While working on the property, Morris told the As "he was a hired killer," "he had lots and lots of weapons," and "he was licensed to carry a concealed weapon."

---

[1] We refer to the As in this manner to protect their privacy. (Cal. Rules of Court, rule 8.90(b)(5).)

2

Randy McKenzie was a laborer working with Morris. On December 30, inside the As's home, Morris smoked methamphetamine, and later displayed to McKenzie a .45-caliber homemade handgun, and accidentally discharged it, causing fragments of a bullet to penetrate the kitchen cabinets and leaving a bullet hole in one. On January 3, 2020, Morris threatened to enter the As's home and rip out all the work he had done to that point. (Morris testified he had actually offered to undo the work he had done if the As were unhappy so they could hire someone else to do the job.)

The As told Morris on January 5 they did not want him to continue working on their home. Morris returned to get his tools and whilst on the property, Eric saw Morris intentionally drop his ladder on Virginia's car, scratching the paint. On that day, Morris texted that he wanted Eric to return his AR-15; Morris testified he had given Eric an incompletely built AR-15 as a gift. Morris sent Virginia text messages reading, "'You really hurt me, and you've wronged the wrong person,'" the As had made "'a terrible mistake,'" and "'forgiveness will not be found.'" Morris also contacted the As's mortgage and insurance companies, advising them the As were allegedly committing insurance fraud and had not pulled the proper permits for the work on their home. Morris also texted: "'You know I'm aware that I'll never see a dime of the money you owe me, but I'll make sure you end up spending more than that in the long run.'"

On January 6, Morris drove by the As's home in disguise. Morris was pointing something at the As's home and texting Virginia "in a harassing manner." Later that day, Morris parked across the street from the As's home wearing a different disguise. Morris was "circling around his car, walking around in an angry, menacing manner, staring and pointing something at [the As's] home. And that's when [Virginia] called the police. And at the same time and simultaneous with that behavior, [she] was receiving menacing texts."

The As asked Morris to stop sending communications to them, but Morris continued to text them. Morris admitted that a police officer called him on January 6 and asked him to stop contacting the As.

On January 18, Virginia saw Morris standing about 25 feet away from her at Ganahl Lumber. Morris was staring at Virginia and shaking his head up and down. Although it was a hot day, Morris was wearing a hat and a heavy jacket. Virginia believed Morris was trying to frighten her.

When asked by the court whether there was anything else that established a course of conduct constituting harassment, Virginia stated: "Well, I would just say that, you know, based on the totality of the circumstances, I think a reasonable person would be in fear for their safety based on his past record with intimidation, domestic violence, being a felon in possession, recklessly bringing a gun into my home and shooting a hole in my cabinet, going through our personal papers, threatening us and another person relentlessly by text at all hours of the night. He was erratic. He was unprofessional. He was superbly emotional to a point that I didn't know how to respond. It was . . . extremely outrageous to me. [¶] He had severe delusions that we owed him money after we paid him money that we actually didn't even feel like we owed him, but we were hoping that he would go away. He was totally out of bounds. He was harassing and stalking me and continued to harass and stalk me."

On January 7, 2020, the As filed a request for a civil harassment restraining order, based on Virginia's declaration. The trial court issued a temporary restraining order (TRO) on that date. The TRO was extended due to delays in the hearing on the civil harassment restraining order. On January 11, 2021, Morris filed a written response.

At an evidentiary hearing in January 2021, Eric, Virginia, and Morris testified; the trial court admitted a single document in evidence—McKenzie's declaration. Following the hearing, the trial court issued the civil harassment restraining order as requested. The trial court found "there was a knowing and willful course of

conduct by Mr. Morris directed at the [As] that seriously alarmed, annoyed, or harassed them and served no legitimate purpose.  It was more than a one-time incident.  It was the sort of thing that would cause a reasonable person to suffer . . . substantial emotional distress and actually cause[d] substantial emotional distress."  The court also found the As more credible than Morris:  "[T]he court finds the [As] more credible regarding some of the other statements that were disputed, such as whether Mr. Morris possessed lots of guns or had a [concealed weapons] permit.  In terms of credibility, while I am finding the [As] generally more credible, it's not because of the felony convictions here of Mr. Morris."

The trial court summarized its findings as follows:  "What is really the big issue from the Court's perspective in this case is that Mr. Morris acknowledges he was asked by the petitioners to cease communication, to stop texting.  In fact, I believe Mr. Morris testified today that he was asked to do that on January 6th.  However, he continued to text repeatedly, telling the [As] they had messed with the wrong guy; that Mr. Morris was not the type of guy to let this thing slide; that he wouldn't stop; that if they think he is going to let this slide, they were stupid; and telling them that he cannot let this go.

"The Court is convinced that that did rise to harassment and would cause a great concern to the [As], particularly given the undisputed fact of Mr. Morris's acknowledgment of military training.  And the disputed testimony that the Court found as credible, the testimony by the [As] as to other weapons-related statements that were made.

"After the [As] asked him to knock it off, he should have knocked it off. He had every right to file a lawsuit to collect the money he says is owed; however, for the reason I stated, I doubt he would win that.  For the reasons I've stated, I suspect that he perhaps knew that he would not win the lawsuit and that's why he didn't file the lawsuit

5

and instead continued to taunt them. And while that is something that Mr. Morris might characterize as being persistent, the Court characterizes it as harassment.

"Under those circumstances and Mr. Morris admittedly being upset, as he put in his response, he felt he had been defrauded by these people, he just made a poor decision in continuing to contact them with, frankly, very strange, odd, and over-the-top texts. They were not straightforward, [Eric and Virginia], I think you owe me some money. Please pay me by this date or I'll see you in court. They were in a very different nature."

Morris filed a notice of appeal.

DISCUSSION

"We review the trial court's decision to grant the restraining order for substantial evidence. [Citation.] 'The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. [Citation.] But whether the facts, when construed most favorably in [the petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review.' [Citation.]" (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497 (*Harris*).) Where the burden of proof in the trial court is by clear and convincing evidence (§ 527.6, subd. (i)), on appeal we review the evidence "to determine whether the trial court 'could have found it highly probable'" that Morris unlawfully harassed the As (*Technology Credit Union v. Rafat* (2022) __ Cal.App.5th __ [2022 Cal.App.Lexis 703, *16-*17]).

Section 527.6, subdivision (b)(3) defines "harassment" as "unlawful violence, a credible threat of violence, or *a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose*. The course of conduct must be such as would cause a

6

reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (Italics added.)

"Course of conduct" is defined as a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email. Constitutionally protected activity is not included within the meaning of 'course of conduct.'" (§ 527.6, subd. (b)(1).)

I.

THE TRIAL COURT DID NOT ERR BY DENYING A CONTINUANCE.

Morris contends the trial court's failure to grant him a continuance of the hearing until his counsel was able to appear prejudiced him and requires reversal. The trial court has broad discretion in deciding whether to grant a request for a continuance. (*Goals for Autism v. Rosas* (2021) 65 Cal.App.5th 1041, 1048; *Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527.) Morris fails to show any abuse of that discretion by the trial court.

The As's request for a civil harassment restraining order had been filed more than a year before the evidentiary hearing was conducted. After Morris was served with the request and supporting papers, the court granted a continuance at his request. The matter was again continued on at least two occasions due to the potential of criminal charges being filed against Morris and the COVID-19 pandemic.

When the matter was finally set for an evidentiary hearing, Morris's counsel filed motions in limine to be heard the first day of the hearing at 8:30 a.m., indicating to the court that counsel was aware of the date and time of the hearing. However, Morris's counsel had not appeared or communicated with the court or with Morris by 10:00 a.m. on the hearing date. Finally, Morris told the trial court that his

7

counsel had just texted him, advising he was appearing at a domestic violence hearing in another case that had been moved from 1:30 p.m. to 8:30 a.m.

Further, at 7:30 a.m. on the day of the evidentiary hearing, Morris's counsel filed a special motion to strike, pursuant to Code of Civil Procedure section 425.16. Counsel noticed the motion for the same date, but at 1:30 p.m. The court denied the motion as untimely, and found that it had been filed as a delaying tactic.

Based on all the foregoing, the trial court explained its decision not to continue the matter: "Typically, if I have an attorney who is missing and I don't have an explanation for why they're missing, I will typically continue the matter out of a concern that the defendant is not being represented and it's no fault of his own. Here . . . I believe that [counsel] has purposely absented himself from the hearing; that he seems to believe by filing this motion for an anti-SLAPP, that that will somehow delay the proceeding; and because his motion was untimely, there's no good cause whatsoever for delaying the petition or the hearing on the petitioner's request. [¶] . . . [¶]

" . . . [T]his is a rare case that I'm going to go forward with the hearing, even though the attorney is not here. It's not to punish Mr. Morris, but because I'm extraordinarily concerned regarding an attempt being made here by [counsel] to delay this hearing after many, many, many delays have already occurred."

Considering the history of delays in the case, counsel's filing of an untimely anti-SLAPP motion for delay purposes, and counsel's failure to communicate directly with the court regarding his absence, the trial court did not err by refusing to again continue the evidentiary hearing in the absence of Morris's counsel.

*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, on which Morris relies, does not affect our analysis. While the appellate court in that case concluded the trial court abused its discretion by denying a request for continuance, it faulted the trial court for focusing on efficiency and expediting caseloads to the exclusion of achieving justice. (*Id.* at p. 1396.) "[T]he court must look beyond the limited facts

8

which cause a litigant to request a last-minute continuance and consider the degree of diligence in his or her efforts to bring the case to trial, including participating in earlier court hearings, conducting discovery, and preparing for trial." (*Ibid.*) The trial court in the present case did consider all the facts, including the number of times the request for a civil harassment restraining order had already been continued, and the apparent bad faith delaying by Morris's counsel. Further, in *Oliveros* the case proceeded to a four-day jury trial and a directed verdict in the plaintiff's favor, all in the absence of the defendant or the defendant's counsel, after the defendant's request for continuance was denied. (*Id.* at p. 1394.) In the present case, by contrast, Morris had a full and fair opportunity to question the witnesses, present evidence, and argue the case in the bench trial.

Even if the trial court had abused its discretion by denying a continuance, Morris has failed to establish any prejudice. After denying the continuance, the trial court granted two of the motions in limine filed by Morris's counsel, and denied the third (regarding hearsay evidence) without prejudice to objections to specific items of evidence. When Morris's counsel appeared a short time after the request for continuance was denied, the court summarized the procedural matters and the testimony that had been given to that point.

## II.

### THE TRIAL COURT DID NOT ERR IN ADMITTING PORTIONS OF THE MCKENZIE DECLARATION.

Morris argues on appeal that the trial court erred by admitting all hearsay evidence and specifically challenges the admission of one hearsay exhibit—the McKenzie declaration. We generally review a trial court's evidentiary rulings for abuse of discretion. (*Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 803.) However, a trial court abuses its discretion when its ruling rests on an error of law. (*Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 73.) If the trial court

9

improperly admitted all hearsay evidence under a mistaken belief that it had no discretion to decide what evidence to admit, that would be an abuse of discretion.

"At the hearing [on the civil harassment restraining order], the judge shall receive any testimony that is relevant, and may make an independent inquiry." (§ 527.6, subd. (i).) "A temporary restraining order may be issued with or without notice, based on a declaration that, to the satisfaction of the court, shows reasonable proof of harassment of the petitioner by the respondent, and that great or irreparable harm would result to the petitioner." (*Id.*, subd. (d).)

The trial court concluded this statute authorized it to admit hearsay evidence during hearings conducted pursuant to section 527.6, subdivision (i). The court's conclusion is well-supported in the law. "[H]earsay evidence, such as a declaration or police report, is admissible during hearings conducted pursuant to section 527.6." (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 521; see *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 729 [trial court is authorized to admit hearsay evidence at evidentiary hearing under § 527.6]; *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 733, fn. 6 [at a hearing to obtain an injunction pursuant to § 527.6, "[b]oth sides may offer evidence by deposition, affidavit, or oral testimony, and the court *shall receive* such evidence, subject only to such reasonable limitations as are necessary to conserve the expeditious nature of the harassment procedure"]; *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550, 555-556 [trial court properly considered hearsay evidence when deciding whether to issue a civil harassment restraining order pursuant to Code Civ. Proc., § 527.8, former subd. (f), which permitted the court to "receive any testimony that is relevant" when issuing an injunction preventing workplace violence].)

McKenzie worked with Morris as a laborer, and in his declaration testified to observing Morris smoke methamphetamine and then accidentally discharge a firearm in the As's home. The trial court found McKenzie's declaration to be credible

10

("I . . . find no reason to disbelieve the declaration offered by Mr. McKenzie"), and Morris's testimony contradicting McKenzie's declaration not credible. However, the trial court did not admit the declaration wholesale; the court found a "good deal" of the McKenzie declaration to be irrelevant and inadmissible. Based on the foregoing authorities, we conclude the trial court did not err by admitting into evidence a portion of the McKenzie declaration at the hearing on the As's request for a civil harassment restraining order.

*Malatka v. Helm* (2010) 188 Cal.App.4th 1074, on which Morris relies, does not affect our analysis. In that case, the trial court refused to consider declarations offered by the defendant in opposing a request for a civil harassment restraining order. (*Id.* at p. 1084.) After the order issued, the defendant did not appeal, but instead filed a motion to dissolve or modify the order. The defendant then filed an appeal from the order modifying but not dissolving the civil harassment restraining order. (*Id.* at p. 1081.) One of the issues raised on appeal was whether the trial court erred by failing to consider the declarations proffered by the defendant in opposition to the order. (*Id.* at p. 1084.) The appellate court did not address any alleged error, because the issue was not properly before it. The court concluded that because any error could have been addressed in a direct appeal from the civil harassment restraining order, it was not reviewable on appeal from the modification order. (*Id.* at p. 1086.)

### III.

#### THE TRIAL COURT'S FINDINGS OF PAST THREATS AND HARASSMENT SHOWED A SUFFICIENT THREAT OF FUTURE HARM TO ISSUE THE CIVIL HARASSMENT RESTRAINING ORDER.

Morris argues no civil harassment restraining order should have issued because the trial court did not make a finding that great or irreparable harm would occur in the absence of the order.

11

Based on the evidence presented at the evidentiary hearing, the trial court could impliedly find a threat of future harm. Morris's texts to the As were "over-the-top" and in them he threatened he would never stop trying to make the As's lives difficult. He was known to possess weapons and had caused one to fire inside the As's home. Morris continued sending texts after the As and a police officer asked him to stop. Even after the TRO issued, Virginia saw Morris at a lumber store and believed Morris was trying to frighten her by staring her down.

In *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401 (*Russell*), and *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 327 (*Scripps*), the appellate courts concluded that the protective orders issued under Code of Civil Procedure sections 527.6 and 527.8, respectively, required findings of a threat of future harm. In both cases, however, the violence or threats by the defendants arose from a single instance of bad conduct that was extremely unlikely to ever be repeated.[2]

More apt to the present case are *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526 (*Garbett*) and *Harris, supra*, 248 Cal.App.4th 484, both of which distinguished *Russell* and *Scripps* based on the continuing bad behavior of the defendants.

---

[2] In *Russell, supra*, 112 Cal.App.4th at page 400, one of two attorneys representing different parties in a case forcefully grabbed the arm of the other. No other acts of violence and no other threats occurred between them. (*Ibid.*) At the time of the hearing on the protective order, the petitioning attorney no longer represented a party in the underlying case, and the two attorneys agreed that they did not regularly do business with or encounter each other. (*Ibid.*)

In *Scripps, supra*, 72 Cal.App.4th at page 328, during a tension-filled meeting between a hospital administrator and a patient's son, the administrator blocked the son's exit from the meeting room to force him to discuss his mother's care. The son pulled the door open, hitting the administrator and pushing her into the wall. (*Ibid.*) After this single act of violence, the son agreed to stay away from the hospital, and his mother's change in health insurance made it unlikely that she would ever return to that hospital. (*Id.* at pp. 329-330.)

In *Garbett*, the City of San Jose sought multiple injunctions protecting a deputy city clerk, the mayor, and city council members from defendant Garbett. Garbett was a gadfly who regularly attended meetings at city hall and spoke during public comment periods about something he was not in agreement with or that negatively impacted him. (*Garbett, supra,* 190 Cal.App.4th at p. 530.) Garbett had multiple interactions with a deputy city clerk regarding his self-nomination as a city council candidate. During one interaction, Garbett claimed he was being harassed and targeted by the police and other city agencies. (*Id.* at p. 531.) During their next encounter, Garbett became agitated and upset, raised his voice, and said, "'What does somebody have to do to change policy around here? Do you have to be—take matters into your own hands like the Black man in Missouri?'" (*Ibid.*) The clerk understood Garbett to be referring to an incident earlier that year when an angry man shot and killed several people at a city hall in Kirkwood, Missouri. (*Id.* at p. 532.) Garbett's remarks caused the clerk to be uneasy and fearful, both when she encountered him again at city hall, and even when she was testifying at the evidentiary hearing. (*Ibid.*) Garbett's remarks were overheard by another deputy city clerk, who was also scared both at the time of the incident and at trial. (*Ibid.*)

The mayor's bodyguard observed Garbett becoming angrier and more agitated over the course of two and one-half years. (*Garbett, supra,* 190 Cal.App.4th at pp. 532-533.) Garbett told the bodyguard there was a conspiracy at city hall to prevent him from running for office, and described the Kirkwood, Missouri shooter as a "'good friend.'" (*Id.* at p. 533.) The bodyguard became "'extremely fearful'" for the safety of the mayor and the city council. (*Ibid.*) The city was forced to implement additional security measures when Garbett was in the presence of the mayor or the city council, including uniformed officers, civilian security staff, and positioning people close to Garbett while he spoke at the podium. (*Ibid.*)

13

Garbett had other negative encounters with city personnel; he had been arrested at least twice for physically assaulting a police officer. (*Garbett, supra*, 190 Cal.App.4th at pp. 534, 535-536.) He shouted at and was combative toward parking control officers. (*Id.* at p. 535.) He regularly complained to utility billing services employees, yelled, used profanities, became aggressive, mentioned the names of infamous serial killers, and told one employee that he had a six-foot deep plot picked out for him in Garbett's back garden. (*Id.* at p. 534.)

Garbett argued that because he did not engage in any alarming conduct or make any threatening statements to anyone after the statement to the deputy city clerk regarding the Missouri shooter, the civil harassment restraining orders should not have issued. (*Garbett, supra*, 190 Cal.App.4th at p. 542.) The appellate court rejected this argument. "[Garbett] . . . continued to appear regularly at City Hall; and . . . he had a history of threatening conduct toward City employees. '"[C]ontext is critical in a true threats case and history can give meaning to the medium."' [Citations.]" (*Garbett, supra*, 190 Cal.App.4th at pp. 542-543.)

In *Harris, supra*, 248 Cal.App.4th 484, a school principal approached a parent after school to discuss the need for the parent to pick up his child on time. (*Id.* at p. 488.) The parent became aggressive and angry, raised his voice, and began yelling at the principal. (*Id.* at pp. 488-489.) The parent placed his hands together and pointed his fingers at the principal as if pointing a gun. (*Id.* at p. 489.) The next day, during a further discussion, the principal thought the parent was "going to physically come after her [and] feared for her safety." (*Id.* at p. 490.) The parent had several other negative interactions with the principal and other staff members over the following month. (*Id.* at pp. 490-494.)

The appellate court agreed that a protective order cannot be issued based solely on a single act of harassment. (*Harris, supra*, 248 Cal.App.4th at p. 499.) The trial court's implied finding that it was reasonably probable future harassment would

14

occur was supported by evidence the parent and the principal would have future interactions while the student was enrolled at that school, the parent's display of aggressive and disrespectful behavior toward other staff members, and the parent's refusal to comply with the principal's directive not to enter the campus. (*Id.* at p. 501.)

As explained *ante*, Morris's harassing communications and behavior toward the As was significant and continuous. Morris admitted that the As and a police officer asked him to stop sending text messages around January 6, but he nevertheless continued sending "over-the-top texts." Morris also stared at Virginia in a frightening way after the TRO issued. Given the tone, context, and continuing nature of Morris's communications and actions toward the As, an implied finding that it was reasonably probable future harm would occur in the absence of a civil harassment restraining order was supported by substantial evidence.

IV.

MORRIS HAD NO LEGITIMATE PURPOSE FOR HIS HARASSING TEXTS, SO THERE IS NO GOOD FAITH DEFENSE OR FIRST AMENDMENT PROTECTION.

Section 527.6, subdivision (b)(3) defines harassment as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and *that serves no legitimate purpose*." (Italics added.) Morris contends his communications with the As were for the purpose of collecting the money they owed him, which was a legitimate purpose. Morris therefore argues he has a good faith defense to the harassment claims, as well as a defense based on his free speech rights under the First Amendment to the United States Constitution.

Because Morris was an unlicensed contractor, the trial court refused to permit his testimony regarding how much he claimed to be owed by the As. "[N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for

15

the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that they were a duly licensed contractor at all times during the performance of that act or contract regardless of the merits of the cause of action brought by the person." (Bus. & Prof. Code, § 7031, subd. (a).) The As included Morris's lack of a contractor's license in their initial request for a protective order and Morris admitted the truth of this statement in his written response and in his testimony. As a matter of law, Morris could not legally collect the money he claims he was owed, and his texts demanding such payment did not serve a legitimate purpose. (Morris does not claim his actions such as driving by the As's home in disguise and staring down Virginia at the lumber store served a legitimate purpose.)

Morris also argues his free speech rights were violated by the civil harassment restraining order, as it prohibited him from seeking repayment from the As.[3] The trial court correctly found Morris's demands for payment were not protected speech because they were not for a legitimate purpose. (*Garbett, supra*, 190 Cal.App.4th at pp. 536-537 [if elements of statute authorizing restraining order are proven, speech constituting threats or harassment may be regulated].)

V.

MOTION TO AUGMENT AND REQUEST FOR ATTORNEY FEES AND SANCTIONS

The As filed a motion to augment the record on appeal pursuant to California Rules of Court, rule 8.155(a)(1)(A). Virginia's declaration attached to the motion states that the documents were admitted into evidence at the evidentiary hearing and were part of the court's files. However, none of the exhibits attached to the motion

---

[3] Morris complains that the trial court "initially . . . rul[ed] on a motion in limine, that precluded the mention of Morris'[s] lack of a contractor's license. Yet, this was repeated by the trial court throughout, that the lack of a contractor's license would have precluded Morris collecting monies owed to him by the [As]." The motion in limine (which the trial court granted) actually sought an order prohibiting reference to the complaint filed by the As with the Contractor's State License Board.

16

was admitted into evidence by the court, and none appears in the trial court's file. We therefore deny the motion to augment.

The As request sanctions against Morris on the ground his appeal is frivolous. The As did not file a separate motion for sanctions as required by California Rules of Court, rule 8.276(b). "Sanctions cannot be sought in the respondent's brief. [Citations.]" (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 919.) We therefore do not consider the As's request for sanctions further.

## DISPOSITION

The judgment is affirmed. Respondents to recover costs on appeal.



MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

17