Filed 8/17/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| TECHNOLOGY CREDIT UNION,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>MATTHEW MEHDI RAFAT,<br><br>       Defendant and Appellant. | H049471<br>(Santa Clara County<br>Super. Ct. No. 21CH009964) |

Appellant Matthew Mehdi Rafat challenges a workplace violence restraining order (WVRO) (Code Civ. Proc., § 527.8[1]) issued against him at the request of respondent Technology Credit Union (TCU) to protect TCU's employee, M.L.[2]  Rafat asserts that the WVRO must be reversed because there was no evidence that he made a credible threat of violence against M.L., as required to support a WVRO.  (See § 527.8, subds. (a), (b)(2).) We agree that the evidence is insufficient to show that Rafat made a credible threat of violence, and we therefore reverse the WVRO.

---

[1] Unspecified statutory references are to the Code of Civil Procedure.
[2] We refer to the TCU employees by their initials to protect their privacy.  (See Cal. Rules of Court, rule 8.90(b)(6),(10).)

## I. FACTS AND PROCEDURAL BACKGROUND

Rafat is a TCU member. On April 5, 2021,[3] TCU filed a petition for a WVRO restraining Rafat and protecting TCU's employee, M.L. TCU claimed that Rafat had made a credible threat of violence against M.L. M.L.'s declaration, which was attached to the petition, described a single March 24 encounter between her and Rafat at a TCU branch location (the branch). M.L. declared that Rafat "became visibly angry and became aggressive towards" her while she was assisting him, made a video recording of her "without her consent," "made several rude and inappropriate statements questioning [her] mental competency," repeatedly refused her request to stop video recording her, and "assaulted [her] when he forced a pen and paper back towards [her] and demanded that [she] write down his number." She declared that this encounter made her "extremely scared for [her] personal safety." M.L. believed that, due to Rafat's "aggression" and "later efforts to cause [her] harm by posting videos of the incident on the internet," Rafat "will come back and seek [her] out at the branch." She stated that further encounters were "likely" because Rafat "frequently visits" the branch.

On April 7, the trial court issued a temporary WVRO and set a hearing for June 1. The court's temporary WVRO included personal conduct and stay away orders barring Rafat from contacting or harassing M.L. or visiting her workplace except for legitimate business.

On April 13, Rafat filed a response to the petition.[4] He admitted that he had had an interaction with M.L. on March 24 and had made a video recording of the interaction, which he posted on his YouTube channel. Rafat denied M.L.'s other claims concerning his conduct on that occasion and denied that he had made a credible threat of violence

---

[3] All dates were in 2021 unless otherwise indicated.
[4] Rafat, who is an attorney, was not represented by counsel below, and he represents himself on appeal.

against M.L. Rafat accused TCU of attempting to silence his criticism of its business practices on YouTube by seeking the WVRO.

Rafat declared that his video of the incident proved that he had not made any credible threat of violence against M.L. Rafat explained that he began recording the interaction after he was unable to open a business checking account at TCU because he wanted to create documentation for a "federal agency complaint" against the credit union. As he is hearing-impaired, Rafat asked M.L. to write down a phone number because he could not hear her or perceive what she was saying due to her mask.

Rafat declared that he had not returned to the branch since the March 24 visit except for a brief visit the next day during which he did not make contact with any employees. He subsequently e-mailed M.L.'s manager requesting an "investigation into [her] conduct" and notified TCU that he would be complaining to a "federal agency" about it.[5]

TCU thereafter unsuccessfully sought to remove Rafat's video of the March 24 incident that he had posted to his YouTube channel.[6] Rafat argued that none of his conduct provided any basis for a WVRO because he made no "credible threat of violence" or any "other improper conduct that lacks a legitimate purpose."

The scheduled June hearing was continued to August 2 after TCU declined to stipulate to a commissioner hearing the case; the temporary WVRO remained in effect. The hearing was subsequently continued to August 11 in order to accommodate Rafat's requests for a court-provided court reporter and communication access real-time translation (CART) reporter.[7]

---

[5] Neither TCU's petition nor M.L.'s attached declaration mentioned Rafat's e-mail to M.L.'s manager.

[6] Rafat maintained that he was engaging in constitutionally protected speech within the meaning of section 425.16. However, he did not file any motion to strike under section 425.16.

[7] Rafat filed a peremptory challenge to the judge originally assigned to hear the case. Another judge was assigned to the case, and the hearing commenced on August 11.

At the August 11 hearing, Rafat's video of most of his March 24 interaction with M.L. was admitted into evidence. This four-minute video begins in the middle of the transaction with Rafat criticizing M.L. Only M.L. can be seen on the video, and she is behind a plexiglass barrier. She twice asks Rafat to stop recording, but the recording continues. Rafat demeans her at length; she remains calm and polite throughout the video, despite his rude and impatient comments. When she asks him to confirm his telephone number, he refuses to do so and insists that she "write it down." He asks for her supervisor's name and phone number and her name, and she gives him a pen and pad, which he pushes back to her through an opening in the plexiglass barrier while saying "stop wasting my time." She provides him with her business card, and he displays it on the video and repeats her full name. M.L. leaves her desk, disappears from view, and then comes out from behind the plexiglass barrier to physically hand him her manager's business card. Rafat says "have a nice day," and the video ends.

Three witnesses testified at the August 11 hearing: M.L., A.C. (M.L.'s supervisor), and Rafat. M.L. testified that she was a Senior Relationship Banker at the branch. She had encountered Rafat once prior to March 24. During an "unpleasant" June 2019 interaction between them, Rafat "ended up talking about the Holocaust and the borders." M.L. contacted A.C., her manager, during the June 2019 interaction because she was seeking an excuse to end her conversation with Rafat. A.C. told M.L. that she "had to be careful when assisting" Rafat because he "would go off topic" and "get aggressive if things weren't going his way." M.L. found the June 2019 interaction "awkward," but it did not make her concerned for her safety.

M.L. testified that on March 24, she first assisted Rafat in making a cash deposit. After Rafat had completed the deposit transaction, he sought to open a business account. M.L. explained to him that "we don't open business accounts the same day." Rafat

4

would need to answer a "questionnaire" about his plans for the business account that would have to be reviewed by TCU before the account could be opened.[8]

When M.L. asked Rafat the first question on the questionnaire, which sought the nature of his business, "he became aggressive." He said he was a "freelance writer" and "became irritated" and "started getting aggressive" when she indicated that she "didn't know what a freelance writer was." They had been conversing for about a minute or a minute and a half before Rafat became "visibly aggressive" and "frustrated," "started belittling [her]," and said "he wanted to open his account the same day." He was "getting angrier by the second," and M.L. was "scared." M.L. was sitting down, and Rafat, who was around six feet tall, was "standing over [her]." There was a plexiglass barrier between them, and Rafat was about three to four feet away from her. M.L. felt intimidated by his "very aggressive" tone. Although she did not initially notice that Rafat was making a video of their interaction, a coworker sent her a message apprising her of this fact. She testified that she asked Rafat three times to stop videorecording her. He did not stop, which made her feel scared. He put his phone near the plexiglass screen and kept getting "closer and closer" to her.

M.L. gave Rafat a pen and pad so that he could write down a phone number, but he "became mad and he pushed" the pen and paper "right back on [her] side" through a hole in the plexiglass barrier and told her to write down the number. While this was happening, M.L. messaged A.C. to see what she should do. M.L. gave Rafat both her business card and A.C.'s business card, going outside the plexiglass barrier to hand A.C.'s business card to him. Rafat remained "hostile," but he left. The entire interaction had taken about five minutes.

After this incident, M.L. felt frightened, had a panic attack, and worried that Rafat would return that same day and harm her. M.L. knew from her colleagues that Rafat

---

[8] M.L. believed that the 10-page questionnaire was required by federal law.

frequently visited the branch. A.C. told M.L. that she had talked to Rafat after the March 24 incident, and Rafat was "very aggressive" and "wanted [her] fired." Rafat also sent an e-mail to A.C. on the day of the incident, which he "CC'd" to M.L., that contained a link to his video of the incident that he had posted on his YouTube channel. The video showed M.L.'s full face and her business card. M.L. was worried that "whoever would watch [the] video" might come to the branch and "try to have" an encounter with her like the one Rafat had had with her. M.L. was at the branch the next day when Rafat briefly returned, but she did not encounter him.

A.C. testified at the August 11 hearing that she had been M.L.'s manager at the time of the 2019 and 2021 incidents. A.C. first encountered Rafat at the branch sometime between 2015 and 2017, and she had dealt with him four or five times over the years. A.C. considered Rafat a "frequent customer." She observed that he was "easily agitated." "If something didn't happen the way that he expected it to . . . he kind of goes off, not on a lecture or a tangent, but he becomes aggressive." A.C. observed Rafat's interaction with M.L. in June 2019. A.C. was not present during the March 24 incident, but she was messaging with M.L. during that incident. A.C. told M.L. to confirm Rafat's contact information so that A.C. could follow up with him.

A.C. received two e-mails from Rafat, one on the day of the incident and one the following day. The first e-mail complained about the incident and sought an investigation of it. The next day, A.C. spoke to Rafat by phone and tried to explain to him the requirements for opening a business account. He "would not listen" and instead insisted that M.L. was "incompetent and unhinged." Rafat was "[v]ery aggressive" and "becoming angrier and angrier." He wanted A.C. to terminate M.L.'s employment. After this phone conversation, A.C. received a second e-mail from Rafat. The second e-

6

mail included a link to the video of the incident that Rafat had posted on YouTube; he again demanded that TCU "terminate" M.L.[9] M.L. was copied on the second e-mail.

Rafat testified at the August 11 hearing that he had gone inside the branch, which was close to his home, "maybe 25 times" over a period of five to seven years. He did not recall encountering M.L. before the March 24 incident. At the beginning of the encounter that day, M.L. assisted him without incident in making a deposit into his personal checking account. He then sought to open a business checking account.

Rafat testified that he "answered all the questions . . . that were asked of [him]." When asked what his business was, he said he was a freelance writer. M.L. "didn't know what that was," so he told her it was "a writer who is freelance," which she did not understand. He motioned towards documentation in a folder that he had in front of him. She continued to ask him questions, and he told her to "just put down freelance writing in the box so we can move on." She did not do so.

Because he believed that M.L. was "distracted," and "either unable . . . or unwilling" to help him open a business account, he took out his phone and "began recording her in order to preserve evidence of employee, either incompetence or misconduct." He remained at all times on his side of the plexiglass barrier.

Rafat admitted that M.L. had asked him at least once to stop recording her but he did not stop. Rafat asked M.L. for her manager's business card or contact information. He testified that he did not ask her to write down his phone number or verify his phone number. Although his hearing impairment made it difficult for him to understand what M.L. was saying, he never informed her of his hearing impairment. Eventually, M.L. got up, retrieved a card from a nearby office, walked over to him, and handed him a business card. She returned to her desk, and he left.

---

[9] A.C. had reviewed a video of the incident taken by TCU's cameras. That video was not introduced into evidence below.

Later that day, Rafat e-mailed A.C. and told her that M.L. had refused to open an account for him. He asked A.C. to investigate M.L.'s "refusal and slash or incompetence." A.C. telephoned him, but he found the phone call unproductive. He offered to send her a video of the incident. However, she said she would not look at it. Rafat denied that he had demanded that M.L. be terminated. On March 26, he sent A.C. a second e-mail containing a link to the video that he had posted on YouTube. In the second e-mail, he notified her of "the potential likelihood of litigation" and told her that he had "filed a federal agency complaint." Rafat was subsequently notified by Google that a privacy complaint had been lodged against his video. He followed Google's instructions, and a modified version of his video was permitted to remain on YouTube.[10]

Rafat's request for judicial notice of various items was denied on relevance grounds. As Rafat did not have the video of his March 25 visit to the branch available to enter into evidence at the August 11 hearing, the court permitted him to send that video to the court if he could find it within two days after the hearing. Apparently he did so, as exhibit B, a video of the March 25 visit, was admitted into evidence. The March 25 video consists of a lengthy monologue by Rafat while he sits in his car and walks around a parking lot and also includes a very brief entry into the branch, during which Rafat takes a business card and immediately leaves. The court continued the hearing to August 25 solely for it to announce its decision, with the temporary WVRO remaining in effect.

On August 25, the trial court announced its decision in an oral ruling. It found that TCU had met its burden and that Rafat had been "rude, impatient, and overly aggressive" toward M.L. The court explained that it had "reviewed the thumb drives, particularly the first one of March 24 which partially recorded the incident of that date. [¶] I've watched and listened to several minutes of the second thumb drive [(exhibit B)]. After seven minutes of listen[ing] to a dissertation on privilege, free speech, et cetera, I stopped

---

[10] In response to the notification, Rafat added a "privacy blur" to some portions of the video that showed M.L.'s face.

reviewing it as it had no bearing on what I need to do today." The court noted that the burden of proof was on TCU to show by "clear and convincing evidence" that Rafat had made "a credible threat of violence."

The trial court found that Rafat's conduct on March 24 "at a minimum, was rude, impatient, sarcastic and intimidating." M.L., in contrast, was "courteous and soft spoken." Rafat was "was overly aggressive, belittling and lost his cool." But the court found: "If the incident on March 24, 2021 was all that had occurred the burden of proof might not have been met and the Court would merely have severely admonished [Rafat] for his behavior. However, the story doesn't end there. [Rafat] returned to the credit union the next day. [Rafat] posted the recording he made on You Tube where it remains to this day. Initially the recording showed [] M.L.'s face. Later it was partially blocked out. I believe there was also testimony that the current video is still on You Tube, also shows a business card. [¶] [Rafat] asked the manager, [A.C.], to fire [M.L.] and made disparaging remarks about her. [¶] [M.L.] was made aware of [Rafat]'s return to the facility the next day as well as his overtures to [A.C.] to have her fired. [¶] [A.C.] was concerned enough to hire security for a time at the facility." The court expressly found M.L.'s testimony credible and concluded that TCU had met its burden of "establishing a credible threat of violence, particularly through [Rafat]'s post of March 24, '21 conduct, including the You Tube postings and correspondence with the credit union manager."

The court issued a WVRO that, like the temporary WVRO, included both a personal conduct order and a stay away order, and the court ordered the WVRO to remain in effect until December 31, 2022. Rafat timely filed a notice of appeal from the order.[11]

---

[11] Rafat asks this court to take judicial notice of various items on the internet. As these items are irrelevant to the issues properly before us in this appeal, we deny his request.

9

## II. DISCUSSION

"Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an order after hearing on behalf of the employee." (§ 527.8, subd. (a).) " 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (*Id.*, subd. (b)(2).) "If the judge finds by clear and convincing evidence that the respondent engaged in unlawful violence or made a credible threat of violence, an order shall issue prohibiting further unlawful violence or threats of violence." (*Id.*, subd. (j).) A trial court's issuance of a WVRO is ordinarily reviewed for substantial evidence. "[W]e resolve all factual conflicts and questions of credibility in favor of the prevailing party, and draw all reasonable inferences in support of the trial court's findings." (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 538 (*Garbett*).)

Rafat contends that we should exercise de novo review because section 909 permits an appellate court to "consider additional facts or evidence" and make factual findings "contrary to those made by the trial court." His reliance on section 909 is misplaced. " 'Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and rule 23 of the California Rules of Court, the authority should be exercised sparingly. [Citation.] Absent exceptional circumstances, no such findings should be made.' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Instead, an appellate court should ordinarily follow the general rule and defer to any factual findings made by the trial court that are supported by substantial evidence. (*Ibid.*) Rafat does not identify any "exceptional circumstances" that would justify departing from the general rule in this case. His principal claim is that the trial court's order is not supported by substantial evidence.

10

Nevertheless, we acknowledge that "an appellate court must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.) Thus, consistent with the standard articulated in *O.B.* for facts proven by clear and convincing evidence, we review the evidence supporting this workplace violence restraining order to determine whether the trial court "could have found it highly probable" that Rafat made a "credible threat of violence" against M.L.

Our careful review of the record discloses insufficient evidence that could support such a finding. Rafat's conduct on March 24 was indisputably rude, impatient, aggressive, and derogatory. Further, he had a history of using aggressive language, including making offensive remarks. However, while he appeared angry and frustrated during the March 24 incident and its aftermath, there was not sufficient evidence produced by TCU linking any of Rafat's statements or conduct to any implied threat of violence. The only threats he made were of litigation and complaints to a federal agency. His actions toward M.L. consisted of berating her, complaining to her supervisor, and posting an accurate video of their March 24 interaction on YouTube.

The evidence in this case did not sufficiently establish that Rafat's posting of the video on YouTube created a threat of violence. The video accurately depicted a business transaction that took place in public, and TCU produced no evidence that the context surrounding the video's placement on Rafat's YouTube page contained any suggestion of

11

a threat of violence or exhortations to violence. Nor were Rafat's complaints about M.L. to A.C. suggestive of any threat of violence. His complaints to A.C. were consistent with his asserted position that M.L. had performed incompetently.

Although the evidence established that Rafat was aggressive, rude, impatient, and sarcastic, as found by the trial court, and M.L. and TCU found the conduct extremely troubling, section 527.8 applies only where there is a "credible threat of violence" that would cause a reasonable person to "fear for his or her safety." Here, Rafat's conduct reasonably caused M.L. to want to avoid any further encounters with him due to his aggressive and rude conduct. In addition, there is substantial evidence that M.L. was actually afraid of Rafat. But we find insufficient evidence in the record to support a factual finding that a reasonable person would believe Rafat would resort to violence against M.L. or would encourage anyone else to do so. Under these circumstances, the WVRO cannot be upheld.

The cases cited by TCU are distinguishable. In *Garbett*, the appellant had a "history of threatening conduct toward [c]ity employees" (*Garbett*, *supra*, 190 Cal.App.4th at p. 542), including assaulting a city police officer (*id*. at p. 535), and mentioning several serial killers to a city employee and telling the employee that he "had a six-foot plot picked out for [him] in his back garden." (*Id*. at p. 534.) The threat that triggered the WVRO was the appellant's statements to city employees that he might "need to take matters into my own hands like that Black man did in Missouri" (*id*. at p. 532), expressly referencing a then-recent incident where a black man had killed six people at a city council meeting in Missouri. (*Id*. at p. 533.) The threats in *Garbett*, unlike Rafat's rude statements, were plainly implied threats to kill the city's employees.

In *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, the appellant yelled at the principal of his son's school (*id*. at pp. 488–489), "put his fingers in [her] face," "clasped his hands together in the shape of a gun, pointing his fingers toward her," and repeatedly walked toward her and away from her, getting so close that "she could feel his breath on

12

her face." (*Id.* at p. 489.) He returned to the school and encountered the principal on several subsequent occasions and continued to appear upset. (*Id.* at pp. 490–493.) This court found the appellant's conduct as a whole combined with his hand gestures satisfied the credible threat of violence requirement. (*Id.* at p. 498.) Here, unlike in *Harris*, there was no evidence that Rafat made any threatening gestures or that he ever approached M.L. any closer than several feet away on the other side of a plexiglass barrier.

In sum, while Rafat was aggressive, rude, impatient, and sarcastic, we decide that the evidence was not sufficient to support a finding by clear and convincing evidence that Rafat made a credible threat of violence against M.L. In particular, we conclude that there was insufficient evidence of "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family." (§ 527.8, subd. (b)(2).) Accordingly the WVRO must be reversed.

### III. DISPOSITION

The order is reversed, and the trial court is directed to dismiss TCU's petition. Rafat is entitled to his appellate costs. (Cal. Rules of Court, rule 8.278(a).)

13

_____
                                    Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Wilson, J.

**H049471**
*Technology Credit Union v. Rafat*

Trial Court:                                          Santa Clara County Superior Court
                                                      No. 21CH009964

Trial Judge:                                          The Honorable Joseph Huber


Matthew Mehdi Rafat, in pro. per., for Defendant and Appellant.

Joseph & Cohen, P.C., Jonathan M. Cohen, Kristina Del Vecchio, and Venus Burns for
Plaintiff and Respondent.

**H049471**
*Technology Credit Union v. Rafat*