Filed 10/31/25; Certified for Partial Pub. 11/26/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COUNTY OF LOS ANGELES, | B327744 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22AVRO01811) |
| v. | |
| NEILL FRANCIS NIBLETT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Valerie L. Skeba, Temporary Judge. Affirmed.

Robert Lucas Law, Robert W. Lucas; Phillips & Rickards and Wendell Phillips[1] for Defendant and Appellant.

---

[1] (See Cal. Style Manual (4th ed. 2000) § 5:15[C] ["Once an attorney has appeared of record in the reviewing court, his or her name is listed in reporting the decision and cannot be withdrawn at a later date either unilaterally or by stipulation."]; *id.*, § 5:15[A] ["Filing an appellate brief . . . constitutes an appearance for listing purposes."].)

Hausman & Sosa, Jeffrey M. Hausman and Larry D. Stratton for Plaintiff and Respondent.

_____

This is an appeal from a three-year workplace violence restraining order (WVRO) issued pursuant to Code of Civil Procedure section 527.8[2] that protects nonparty Samuel S.[3] from defendant and appellant Neill Francis Niblett.  Prior to the issuance of the WVRO, both individuals were employed by plaintiff and respondent County of Los Angeles's (the County's) fire department; Samuel was an assistant chief and Niblett was a senior mechanic.  During the WVRO proceedings, the County offered evidence showing Niblett had often raised his voice to Samuel to complain about work-related decisions, Niblett on one

_____

[2] Undesignated statutory citations are to the Code of Civil Procedure.  Although the Legislature made changes to section 527.8 after the trial court issued the WVRO on January 18, 2023 (see, e.g., Stats. 2023, ch. 289, § 2.5 [filed with Sec'y of State on Sept. 30, 2023]), the parties do not dispute that the version of the statute that was effective on the date of the order's issuance governs our appellate review (see also *Goldstein v. Superior Court* (2023) 93 Cal.App.5th 736, 747 ["The general rule is that unless the Legislature expressly states otherwise, or it is very clear from extrinsic sources that the Legislature must have intended a retroactive application, a newly enacted statutory provision applies prospectively only."]).  For that reason, all references in this opinion to section 527.8 are to the version that was in effect on January 18, 2023, which version appears in Statutes 2015, chapter 411, section 2.

[3] As a person protected by a WVRO, we refer to this individual in the first instance by his first name and last initial (Cal. Rules of Court, rule 8.90(b)(6)), and thereafter by his first name only for ease of reference.  No disrespect is intended.

occasion shouted profanities at Samuel and got so close to Samuel's face that Niblett was spitting on him while shouting, and, several days after that profanity-laden encounter, Niblett had a conversation with a secretary in which Niblett (a) expressed his frustration that one of his mechanics had been transferred without his knowledge and (b) alluded to an incident in which a firefighter fatally shot another firefighter. The trial court found clear and convincing evidence that Niblett's reference to the prior shooting constituted a credible threat of violence warranting issuance of the WVRO.

On appeal, Niblett's challenge to the evidentiary sufficiency of the order fails because the trial court could rationally have concluded it was highly probable that a reasonable person would construe Niblett's statement mentioning the shooting as an implied threat to commit an act of violence against fire department management if it continued to make decisions with which he disagreed. Further, although Niblett did not expressly threaten to harm Samuel, he was a logical target of Niblett's implied threat who may be named as a protected party pursuant to section 527.8. Our rejection of Niblett's evidentiary challenge is fatal to his claim the WVRO violates his First Amendment rights. Niblett's claim the firearm restriction in the restraining order violates his Second Amendment rights is also unpersuasive. Niblett has forfeited the remainder of his claims of error by either failing to raise them adequately or asserting them for the first time in his reply brief. For all these reasons, we affirm the WVRO.

Additionally, this case illustrates that misuse of artificial intelligence threatens the integrity of the appellate process. It appears that Niblett's appellate counsel misused artificial

intelligence in preparing his opening brief by misciting the holdings of numerous cases, even those from the principal cases on which he relies, and by citing at least one case that does not even exist. Further, Niblett's counsel failed to correct those erroneous citations even after the County identified many of them in its appellate brief. Accordingly, in a separate ruling issued concurrently with this opinion, we order Niblett's appellate counsel to show cause why he should not be sanctioned for misusing artificial intelligence.

### FACTUAL AND PROCEDURAL BACKGROUND[4]

We summarize facts pertinent to our disposition of this appeal in this Factual and Procedural Background and provide more detail as to facts particularly relevant to certain claims of error in our Discussion, *post*.

Prior to the commencement of the instant action, Niblett was employed as a senior mechanic at the County's fire department and Assistant Chief Samuel was Niblett's supervisor.[5] According to the County, on October 5, 2022, Niblett

---

[4] We derive our Factual and Procedural Background in part from the parties' admissions in their filings and the County's assertions that Niblett does not dispute in his reply brief. (See *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 772, fn. 2, 773–774 (*Association for Los Angeles Deputy Sheriffs*) [employing this approach].)

[5] Samuel testified that the County "placed [Niblett] off of work" because of his threatening conduct and that, as of the January 18, 2023 hearing on the WVRO, Niblett had not returned to work.

acted in a "verbally abusive" manner toward Samuel after Samuel asked Niblett to pick up parts Niblett had left on the floor of a fire department facility. The County further avers that on October 11, 2022, Niblett made the following statement to Cari Hughes, a secretary for the fire department: "If they don't change things in this department, they're going to have another situation like they had with Tatone." There is no dispute that in June 2021, a firefighter named "Tatone" fatally shot another firefighter at Station 81.

On November 18, 2022, the County filed its petition for a WVRO under section 527.8 against Niblett, which named Samuel as the employee in need of protection. The County supported the petition with declarations from Samuel and Hughes. Shortly after the County filed the petition, the trial court issued a temporary restraining order protecting Samuel from Niblett.

Niblett filed a verified response denying the allegations in the petition. Accompanying his response is a declaration from Luis Del Cid, a fire equipment mechanic and a union president, who attested that Niblett was a union steward. Although in his declaration Del Cid described an October 5, 2022 interaction between Samuel and Niblett in which Samuel supposedly used "obscene language," Del Cid was not a percipient witness to this event.

The trial court heard the County's petition on January 18, 2023. Hughes, Samuel, and Del Cid testified at the hearing. Although Niblett appeared, he did not testify. At the conclusion of the hearing, the court granted the petition based on its finding, by clear and convincing evidence, that Niblett's October 11, 2022 statement referencing Tatone constituted a credible threat of violence under section 527.8. On the same date

5

as the hearing, the trial court issued the WVRO, which is set to expire on January 18, 2026. Among other things, the WVRO bars Niblett from harassing Samuel or entering Samuel's workplace, and prohibits Niblett from possessing firearms or ammunition.

On March 3, 2023, Niblett timely appealed from the WVRO.

## APPLICABLE LAW AND STANDARD OF REVIEW

### A. *Section 527.8*

Section 527.8, subdivision (a) provides: "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an order after hearing on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer." (Stats. 2015, ch. 411, § 2.)[6]

"For purposes of . . . section [527.8]: [¶] . . . [¶] . . . 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (See Stats. 2015, ch. 411, § 2 [§ 527.8, subds. (b) & (b)(2)].) "This section does not permit a court to issue a temporary restraining order or order after hearing prohibiting speech or other activities that are

---

[6] (See fn. 2, *ante* [noting the parties do not dispute the version of § 527.8 found in Stats. 2015, ch. 411, § 2 governs our review].)

6

constitutionally protected, or otherwise protected by Section 527.3 or any other provision of law." (Stats. 2015, ch. 411, § 2 [§ 527.8, subd. (c)].)

"At the hearing [on a petition under section 527.8], the judge shall receive any testimony that is relevant and may make an independent inquiry. Moreover, if the respondent is a current employee of the entity requesting the order, the judge shall receive evidence concerning the employer's decision to retain, terminate, or otherwise discipline the respondent. If the judge finds by clear and convincing evidence that the respondent engaged in unlawful violence or made a credible threat of violence, an order shall issue prohibiting further unlawful violence or threats of violence." (See Stats. 2015, ch. 411, § 2 [§ 527.8, subds. (h) & (j).]

"In the discretion of the court, an order issued after notice and hearing under this section may have a duration of not more than three years . . . ." (Stats. 2015, ch. 411, § 2 [§ 527.8, subd. (k)(1)].) "A person subject to a protective order issued under this section shall not own, possess, purchase, receive, or attempt to receive a firearm or ammunition while the protective order is in effect." (*Ibid.* [§ 527.8, subd. (s)(1)].) "The court shall order a person subject to a protective order issued under this section to relinquish any firearms he or she owns or possesses pursuant to Section 527.9." (Stats. 2015, ch. 411, § 2 [§ 527.8, subd. (s)(2)].) "Every person who owns, possesses, purchases or receives, or attempts to purchase or receive a firearm or ammunition while the protective order is in effect is punishable pursuant to Section 29825 of the Penal Code." (Stats. 2015, ch. 411, § 2 [§ 527.8, subd. (s)(3)].)

7

Additionally, to obtain a WVRO, " 'a plaintiff must establish by clear and convincing evidence not only that a defendant engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future.' [Citation.]" (See *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 537–538 (*Garbett*).)

## B.    *Standard of review*

In reviewing an evidentiary challenge to a WVRO, " 'an appellate court must account for the clear and convincing standard of proof . . . .  [T]he question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' [Citation.]" (See *Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323 (*Technology Credit Union*).)

Under this "highly deferential" standard of review, "[i]f substantial evidence supports factual findings, those findings must not be disturbed on appeal.  [Citation.]  Inferences favorable to appellants may create conflicts in the evidence, but that is of no consequence.  [Citation.]  When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence— contradicted or uncontradicted—to support the trial court

8

findings." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*).)

" ' "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." [Citation.]' [Citation.] Thus, ' " 'it is the appellant's responsibility to affirmatively demonstrate error' " ' by ' " 'supply[ing] the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " [Citation.]' [Citations.] The appellant bears this burden of rebutting the presumption of correctness accorded to the trial court's decision, regardless of the applicable standard of review." (*Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at pp. 776–777.) A corollary of the presumption of correctness is " 'the doctrine of implied findings,' " which requires " 'the reviewing court [to] infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' [Citation.]" (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

## DISCUSSION

Because of the length of our opinion, we recap in this introduction the conclusions set forth in the succeeding parts of this Discussion.

In our Discussion, part B, *post*, we reject Niblett's challenge to the sufficiency of the evidence supporting the trial court's finding that the following statement he made to Hughes on October 11, 2022 constitutes a credible threat of violence for the purposes of section 527.8: "If they don't change things in this department, they're going to have another situation like they had with Tatone."

In our Discussion, parts C, D, and E, respectively, *post*, we reject Niblett's First Amendment challenge to the WVRO, rule that Niblett forfeited his claim that the WVRO violates section 527.3, and conclude he failed to demonstrate the firearm restriction in the restraining order infringes on his Second Amendment rights.

Niblett forfeited his remaining arguments either by failing to raise them adequately in his opening brief or withholding them entirely from that initial brief.  (Discussion, part F, *post*.)

In our Discussion, part G, *post*, we discuss Niblett's appellate counsel's suspected misuse of artificial intelligence.

Before turning to these issues, we explain why we reach the merits of Niblett's appeal notwithstanding the County's assertion that it is moot.

## A. Assuming Arguendo This Appeal Is Moot Because It Will Not Be Resolved Before the Restraining Order Expires, We Exercise Our Discretion To Entertain the Appeal on the Merits

"A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." '  [Citation.]  A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of [the appellant], to grant him any effect[ive] relief." '  [Citation.]"  (See *In re D.P.* (2023) 14 Cal.5th 266, 276.)  " ' "As a general rule, 'an appeal presenting only abstract or academic questions is subject to dismissal as moot.' [Citation.]" [Citation.]' [Citation.]"  (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 120.)  "Even when a case

10

is moot, [however,] courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P.*, at p. 282; see also *id.* at p. 286 [indicating an appellate court may entertain a moot appeal to "serve the interest of justice"].)

The County argues, "This appeal will probably not be resolved until after th[e] date" the restraining order expires (i.e., January 18, 2026) "or close to that date." The County thus maintains, "The case will likely be moot, and this appeal should be dismissed."

Niblett counters, "[A]ny decision on mootness is premature at this point and turns on factual determinations based on evidence not in the record." Further, Niblett represents, "The County is seeking to discipline Niblett for the same incidents giving rise to the WVRO and [is] using the WVRO as evidence in its proceedings. And even absent the pending disciplinary proceedings, the WVRO would remain in his personnel file absent reversal."

Whether this appeal will be resolved after the WVRO's January 18, 2026 expiration date is not clear. (See, e.g., Cal. Rules of Court, rule 8.272(b)(1)–(b)(2) [indicating the date a remittitur will be issued depends in part on whether the Supreme Court decides to review the Court of Appeal's decision].) Assuming arguendo the County is correct the appeal will not be resolved before January 18, 2026, we exercise our inherent discretion to reach the merits of Niblett's appeal. We elect to do so for two reasons: (1) The WVRO is based on a finding that Niblett made a credible threat of violence (see Factual & Procedural Background, *ante*), which may cause Niblett reputational harm even after the WVRO expires; and (2) the miscitations in Niblett's briefing raise important issues of public

11

interest regarding the impact of artificial intelligence on the integrity of judicial processes and an attorney's obligation as an officer of the court (see Discussion, part G, *post*).

## B. Substantial Evidence Supports the Trial Court's Finding That Niblett Made a Credible Threat of Violence

Niblett concedes, "[H]e made the statement, 'If they don't change things in this department, they're going to have another situation like they had with Tatone' to . . . Hughes." Niblett argues the trial court erred in finding this statement was a credible threat of violence. We disagree.[7]

### 1. We reject Niblett's contention the County had to show an "immediate threat of violence" and "intent to harm" to establish a credible threat of violence

As a preliminary matter, Niblett argues in his opening brief that a statement is not a credible threat of violence unless there is evidence of "an immediate threat of violence" and "intent to harm." "Immediate threat of violence" and "intent to harm" are not elements of section 527.8, subdivision (b)(2)'s definition of " '[c]redible threat of violence.' " (See Stats. 2015, ch. 411, § 2.) The statutory definition provides in full: " 'Credible threat of

---

[7] Given our conclusion, we do not address Niblett's argument the County failed to present sufficient evidence that he engaged in a course of conduct warranting issuance of the WVRO. (See also Stats. 2015, ch. 411, § 2 [§ 527.8, subd. (b)(2) provides that either "a knowing or willful statement *or* course of conduct" can give rise to a finding of a credible threat of violence, italics added].)

violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (*Ibid.*)

Notwithstanding the absence of statutory text supporting his position, Niblett claims that certain case law holds that an immediate threat of violence and an intent to harm are elements of a credible threat of violence.

First, Niblett asserts *Garbett* held that a credible threat of violence "must include evidence of a specific, immediate intent to act." (Citing *Garbett*, *supra*, 190 Cal.App.4th at p. 537.) *Garbett* did not so hold. *Garbett* held that a restrained party's "subjective intent was *not* required for his conduct to be deemed a credible threat." (See *Garbett*, at p. 538, italics added.) The Court of Appeal further explained section 527.8 "*requires only* a statement made knowingly and willfully, which would place a reasonable person in fear for his or her safety." (See *Garbett*, at p. 539, italics added.)

Next, Niblett claims "*R.D. v. P.M.* (2021) 68 Cal.App.5th 1012" held that "[s]tatements made about workplace grievances are not credible threats unless accompanied by evidence of intent to harm." *No case* with that name appears at page 1012 of volume 68 of the fifth series of the California Appellate Reports, and we were unable to locate a case with that name decided in 2021.[8]

---

[8] The County believes Niblett intended to refer to *R.D. v. P.M.* (2011) 202 Cal.App.4th 181 (*R.D.*), and argues that case nonetheless does not support Niblett's "assertion that '[s]tatements about workplace grievances are not credible threats

Furthermore, Niblett cites *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324 for the proposition that "the threat must show immediacy and specificity, and subjective fears alone are not enough" to establish a credible threat. (Citing *Scripps Health*, at p. 335.) The page from the *Scripps Health* decision upon which Niblett relies does not address whether a statement must threaten immediate harm to be actionable under section 527.8. (See *Scripps Health*, at p. 335.)[9] He also claims page 1228

unless accompanied by evidence of intent to harm.' " The County is correct; *R.D.* does not hold intent to harm is an element of the statutory definition of credible threats of violence. (See *R.D.*, *supra*, 202 Cal.App.4th at pp. 183–184, 189–190 [instead, in reviewing a restraining order issued under § 527.6, the Court of Appeal ruled that evidence "demonstrating [the restrained party's] intention to harass" the protected party "support[ed] the trial court's implied conclusion 'that wrongful acts [constituting harassment] are likely to recur' "].) In any event, because Niblett does not address in his reply or notice of errata to the opening brief whether the 2011 decision found on page 181 of volume 202 of the fourth series of the California Appellate Reports establishes that evidence of intent to harm is required, we do not discuss that question further.

[9] Niblett further asserts that pages 335 and 336 of the *Scripps Health* decision establish that "the absence of . . . evidence" of "overt actions, preparation, or specific threats directed at an[ ] individual" "prevents a finding of a credible threat." This excerpt of the *Scripps Health* opinion does not address any of those issues. (See *Scripps Health*, *supra*, 72 Cal.App.4th at pp. 334–336 [instead holding that a petitioner must show that without a WVRO, there is a "reasonable probability unlawful violence will occur in the future," and reversing the trial court's order based on the Court of Appeal's conclusion the evidence there did not satisfy that standard].)

of *Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219[10] supports his assertion that the "lack of immediacy further undermines the trial court's finding of a credible threat." His cited excerpt from *Parisi* does not discuss that issue. (See *Parisi*, at p. 1228.) Apart from asserting that *Scripps Health* and *Parisi* establish that a threat of immediate harm is an essential element of a credible threat of violence, Niblett does not explain how these authorities support that contention. Accordingly, we do not address that issue further. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 165, fn. 6 (*United Grand Corp.*) [" '[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case.' [Citation.] '[W]e may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' "].)

Having rejected Niblett's attempt to add new elements to section 527.8's definition of "credible threat of violence," we turn to whether substantial evidence supports the trial court's finding that Niblett made such a threat. (Discussion, parts B.2–B.3, *post*.)

> ### *2. Niblett fails to show the trial court erred in finding he made a knowing and willful statement that would place a reasonable person in fear for his or her safety*

Niblett does not dispute, and thus tacitly agrees with, the County's assertion that in making the statement in question to

---

[10] *Parisi* was overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.

15

Hughes on October 11, 2022, Niblett made a "knowing and willful statement" for the purposes of the statutory definition of "credible threat of violence."[11]  The remainder of this section analyzes whether Niblett's statement would place a reasonable person in fear for his or her safety.  We address the lack of legitimate purpose element of the statutory definition of credible threat of violence in Discussion, part B.3, *post*.

A knowing and willful statement would place a reasonable person in fear for his or her safety for purposes of section 527.8 if "a reasonable person would believe [the person making the statement] would resort to violence . . . ."  (See *Technology Credit Union*, *supra*, 82 Cal.App.5th at p. 324.)  In analyzing an alleged threat, " ' "[c]ontext is critical . . . and history can give meaning to the medium." ' [Citation.]"  (See *Garbett*, *supra*, 190 Cal.App.4th at pp. 542–543.)  Reading the record in the light most favorable to the WVRO, we conclude there is sufficient evidence from which the trial court could have inferred, to a high degree of probability, that a reasonable person would have interpreted Niblett's reference to Tatone as an expression of his intent to shoot members of department management if they continued to make decisions with which he disagreed.[12]

---

[11]  (See *Association for Los Angeles Deputy Sheriffs, supra*, 94 Cal.App.5th at pp. 773–774 [holding that the appellants "tacitly concede[d]" a point raised in the respondents' brief by "failing to dispute it in their reply"].)

[12]  Implied credible threats of violence are actionable under section 527.8.  (See, e.g., *Garbett*, *supra*, 190 Cal.App.4th at pp. 530–532, 541–542  [affirming the trial court's issuance of a WVRO based on, inter alia, the restrained party's "suggest[ion] that his only recourse" for a city's refusal to " 'change [its]

16

First, Hughes testified that Niblett stated, " 'If they don't change things in this department, they're going to have another situation like they had with Tatone' " during a conversation in which Niblett was "upset" that management had not informed him that a mechanic in Niblett's work group had been sent to another work area.[13]  Hughes also testified that shortly before making that statement, (1) Niblett "pointed to [a chief's] door" and said the chief was " 'going to be personally sued' "; and (2) Niblett indicated that he was "able to get rid of . . . two chiefs that had work[ed] for [the] department" via a prior lawsuit.  The trial court reasonably could have inferred from these circumstances that Niblett was angrily intimating to Hughes he would employ violence to "get rid of" department management if it did not change course.  Further, because Samuel attested in his declaration accompanying the County's petition that the sheriff's department informed him Niblett was the registered owner of two rifles, the trial court could rationally have found Niblett was capable of acting on his threat.[14]

policy' " was to " 'take matters into [his] own hands like the Black man in Missouri[,]' " which was an allusion to an incident several months earlier "when an angry man in a Missouri city shot several people at city hall, killing five of them"].)

[13]  Hughes suggested in her testimony that Niblett appeared to be upset the other mechanic had been transferred without Niblett's knowledge because, as "the senior mechanic over th[e] group" in which the transferred mechanic was a member, Niblett "turns in the time . . . for all of th[ose] mechanics."

[14]  Although Samuel was relaying information from the sheriff's department regarding Niblett's firearm ownership, the

17

Second, the trial court could have found a reasonable person hearing this statement would not have construed Niblett's reference to the shooting as an idle threat. Hughes testified that she reported her conversation with Niblett to Samuel, and she later provided a statement to the sheriff's department concerning the incident. Additionally, the shooting at Station 81 occurred just over a year before Niblett had this conversation with Hughes in October 2022. (See Factual & Procedural Background, *ante* [noting the shooting occurred in June 2021].) Samuel indicated in his testimony that the union representing field mechanics had "constantly" been asking for "body armor" since the shooting. Similarly, Niblett's sole witness at trial, Del Cid, characterized the provision of body armor as a "hot topic" among department employees. Given the heightened state of fear among fire department personnel, the trial court could rationally have inferred that a reasonable employee would have interpreted Niblett's statement as a sincere expression of intent to commit violent acts.

Third, the County presented evidence tending to show that management's decisions had the potential to trigger an aggressive response from Niblett. In particular, Samuel attested (a) "Niblett ha[d] raised his voice at [Samuel] on numerous occasions to complain about various work-related decisions with which he did not agree," (b) Samuel had "been advised by office staff that . . . Niblett ha[d] spent hours complaining about

_____

trial court could consider such hearsay testimony in ruling on the County's petition. (See *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550, 558 ["Hearsay evidence clearly may be relevant, and if hearsay evidence *is* relevant, section 527.8 requires that the court receive it."].)

18

[Samuel] and management personnel," and (c) "[Niblett's] behavior ha[d] escalated over time from complaints to more aggressive verbal altercations." Samuel further declared that on October 5, 2022, Samuel asked Niblett to "pick up the parts [Niblett] had left on the floor from working overtime the past Saturday," and Niblett responded by slamming the door of his truck and approaching Samuel while yelling profanity at him. Samuel attested Niblett ended up being "in such close proximity to [Samuel's] face that he was spitting on [Samuel] as he was yelling," which caused Samuel to feel "threatened" by Niblett's behavior.[15] Samuel declared Niblett "continued to yell expletives until [Samuel] advised . . . Niblett that the conversation was over and walked away in an attempt to deescalate the situation."

Niblett fails to persuade us that this evidence falls short of satisfying our deferential standard of review. Niblett insists he was not threatening to shoot department management, but instead made "a hypothetical warning about potential consequences of poor management . . . ."

To support his contention that his statements were merely hypothetical, Niblett cites Del Cid's declaration to the effect that union members "speculated that a contributing factor [in the prior shooting at Station 81] was management's decision to only

---

[15] Niblett cites pages 47 to 48 of the reporter's transcript for the proposition Samuel "stated he did not feel threatened by Niblett's actions in the . . . October 5 incident where he was present." Niblett's characterization of Samuel's testimony is misleading. In that portion of the transcript, Niblett's counsel posited that Samuel "never felt threatened *to the point . . . that [Samuel] called the sheriff's department* at the time the [October 5th] interaction occurred," to which Samuel replied, "That's a fair statement." (Italics added.)

19

transfer Tatone and not the . . . [murdered] firefighter during the investigation of [an] earlier, non-lethal, incident."  Niblett further maintains Del Cid attested (a) Chief Connett told Del Cid Samuel complained that a mechanic named David Clutter had threatened Samuel on October 5, 2022, and (b) after that incident, "the department transferred Clutter, but not [Samuel], also to a remote location involving a significant commute apparently because Clutter had threatened" Samuel.  Niblett further relies on Del Cid's declaration for the proposition that "this transfer apparently violated the [union's collective bargaining agreement with] the County because transfers are supposed to include two weeks' notice and a statement of cause."  Niblett thus appears to be arguing through the medium of Del Cid's declaration that Niblett was merely cautioning Hughes that management's decision to transfer only Clutter, but not Samuel, could cause Clutter to react in much the same way as Tatone did when he was transferred, that is, by shooting department personnel.

Niblett's reliance on Del Cid's testimony is unavailing. "Venerable precedent holds that, in a bench trial, the trial court is the 'sole judge' of witness credibility." (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582.)  The trial court thus could " 'disregard' " the evidentiary foundations of Niblett's alternative interpretation of his reference to the Station 81 shooting—i.e., Del Cid's declaration testimony that union members believed Tatone's transfer may have motivated him to commit murder; Clutter alone had been transferred after Samuel claimed Clutter threatened him; and Clutter's transfer apparently violated the collective bargaining agreement.  (See *ibid.*)  Furthermore, Hughes testified Niblett was upset that management had sent a mechanic in Niblett's group to another location without first

20

informing Niblett.  This evidence suggests that Niblett was angry about the effect the transfer had on him (see fn. 13, *ante* [explaining Hughes intimated in her testimony Niblett seemed upset about the transfer because Niblett is responsible for submitting the transferred mechanic's time records]), and not that he was expressing concern that another purportedly unfairly treated employee would commit acts of violence in the future.

In addition, Niblett claims Hughes testified "she did not view the comment made to her as a threat or that he was threatening" Samuel.  He also asserts Hughes's testimony shows his statement was merely "hypothetical, suggesting that a similar situation could occur if management did not address workplace issues."  Niblett further contends, "[Samuel] did not testify that he believed Niblett himself would engage in violence, but 'that somebody' might."

Niblett's reliance on Hughes's and Samuel's respective testimony is unavailing.  Hughes's testimony that Niblett did not threaten Samuel or say he was going to bring in a gun and shoot people does not undermine our conclusion there is substantial evidence Niblett made an *implied* threat to commit an act of violence if management continued to make decisions he reviled.  Hughes's testimony Niblett "just said" that "another Station 81" "could happen" and that she did not believe Niblett "*was going to go get a gun and come down and shoot somebody*" (italics added) is likewise consistent with our determination Niblett made a threat that was conditioned on management's failure to make changes he desired.  Furthermore, Samuel's testimony to the effect that Niblett's statement to Hughes signaled "[t]hat somebody was going to come in and shoot up the place" is hardly

exculpatory, especially in light of Samuel's attestation that he did in fact "t[ake] this statement [from Niblett] as a threat . . . ."

Even if Hughes's or Samuel's testimony could be construed in the manner Niblett suggests—i.e., that the two witnesses did not subjectively interpret Niblett's reference to the shooting as a credible threat of violence—Niblett's claim of error would still fail. Section 527.8 requires clear and convincing evidence of "a knowing and willful statement . . . that would place *a reasonable person* in fear for his or her safety" (see Stats. 2015, ch. 411, § 2, italics added [subds. (b)(2) & (j) of § 527.8]). As explained above, the trial court rationally could have inferred it is highly probable that a reasonable person hearing this statement would have feared for his or her safety.

Lastly, Niblett contends Hughes "testified Niblett's statement was vague[ and] not directed at any specific individual." Insofar as Niblett is claiming the trial court lacked authority to issue the WVRO because he did not direct his threat specifically at Samuel, Niblett is mistaken. "An employer may seek relief under section 527.8 on behalf of any employee who is credibly threatened with unlawful violence, whether or not that employee is identified by the defendant." (See *USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 443.) Put differently, "an employer subjected to generalized threats of workplace violence may obtain relief under section 527.8 on behalf of an employee who is a logical target of the threats . . . ." (See *USS-Posco Industries*, at p. 438.)

There is substantial evidence Samuel was a logical target of Niblett's threat. As we explained earlier in this section, the trial court could have rationally found clear and convincing evidence that a reasonable employee would have deduced Niblett

22

threatened to shoot department management if it continued to make decisions he found objectionable. The court also could have reasonably inferred when Niblett made this threat, Samuel was a member of department management because he was an assistant chief and Niblett's supervisor. (Factual & Procedural Background, *ante*.) As we also have explained, Samuel attested that on several occasions, Niblett protested Samuel's work-related decisions by yelling at him, and that on one such occasion, Niblett got so close to Samuel's face that Niblett was spitting on Samuel as Niblett was yelling, and Samuel felt threatened by Niblett's close proximity to him. The court thus could have reasonably found that Samuel was the subject of Niblett's ire.

In sum, the trial court reasonably could have found it highly probable that by telling Hughes, "If they don't change things in this department, they're going to have another situation like they had with Tatone," Niblett made a knowing and willful statement that would place a reasonable person in fear for his or her safety.

### 3. *Niblett does not demonstrate the trial court erred in finding that his statement did not serve a legitimate purpose*

Niblett maintains his "statement [to Hughes] regarding 'Station 81' served a legitimate purpose: Expressing dissatisfaction with workplace management and systemic issues." Niblett claims this statement "ar[ose] from his union duties and involved ongoing workplace grievances pursued by Local 119," "the union which represents Fire Equipment Mechanics and Senior Fire Equipment Mechanics," and that the statement "fall[s] squarely within the realm of workplace advocacy by a union steward." In support of this position, Niblett cites pages 12

23

and 13 of the reporter's transcript for the proposition that Hughes "admitted [at trial] that the comment arose out of labor-management grievances and did not coincide with any actions or threats to carry out violence." Niblett also claims Samuel "acknowledged that Niblett often complained about management decisions."

As we explained in our Discussion, part B.2, *ante*, the record contains substantial evidence from which the trial court reasonably could have found it highly probable that Niblett made a knowing and willful statement that a reasonable person would interpret as a threat to shoot fire department personnel if management continued to make decisions Niblett disliked. This conclusion is fatal to Niblett's claim he was merely criticizing management's decisions.

We further conclude Niblett's suggestion he referred to the shooting at Station 81 to advocate for changes to management's decisions in his capacity as a union steward is baseless. At trial, Hughes indicated she did not know Niblett was a union steward. We also fail to see how referencing the shooting in a conversation with Hughes serves the union's interests, given that Hughes testified she was a secretary with no supervisory authority over Niblett, and Niblett does not assert she had any management authority.

Thus, the trial court did not err in finding Niblett lacked a legitimate purpose for making the statement in question to Hughes. Consequently, we reject Niblett's evidentiary challenge to the trial court's finding of a credible threat of violence for the purposes of section 527.8.

## C. Niblett Does Not Show the WVRO Violates His First Amendment Rights

"The right to free speech is not absolute or unlimited. [Citations.]  As our Supreme Court has explained, ' "[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.]" ' " (*Garbett*, *supra*, 190 Cal.App.4th at pp. 536–537.) In determining whether a statement is a " 'true threat' " beyond the scope of the First Amendment's protection, courts analyze " 'whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.' " (See *id.* at p. 540; see also *id.* at p. 539 [reiterating this definition of " 'true threat[s]' "].)

Niblett argues his October 11, 2022 statement to Hughes referencing the earlier shooting incident at Station 81 does not constitute a true threat lacking First Amendment protection. "[I]f the elements of section 527.8 are met by the expression of a credible threat of violence toward an employee, then that speech is not constitutionally protected and an injunction is appropriate." (*Garbett*, *supra*, 190 Cal.App.4th at p. 537.) Because we have concluded substantial evidence supports the trial court's finding Niblett made a credible threat of violence for the purposes of section 527.8, Niblett's "reliance on the First Amendment [is] unavailing." (See *Garbett*, at p. 537.)

We acknowledge Niblett intimates in the standard of review section of his opening brief that the fate of his First Amendment claim is not entirely dependent on our disposition of his challenge to the sufficiency of the evidence supporting the

25

WVRO. Specifically, he cites *In re George T.* (2004) 33 Cal.4th 620 for the proposition that we "should review plausible First Amendment issues independently." (Citing *In re George T.*, at p. 632.) Niblett thus appears to maintain the substantial evidence standard does not apply to his First Amendment claim.

*In re George T.* held, "[A] reviewing court should make an independent examination of the record in a [Penal Code] section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (*In re George T.*, *supra*, 33 Cal.4th at p. 632; see also *id.* at pp. 629–630 & fn. 5 [indicating the Supreme Court was referring to Penal Code section 422 in the text quoted above, and that the statute proscribes "making criminal threats"].) The Supreme Court explained, however, this form of "[i]ndependent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different." (See *id.* at p. 634.) Under this appellate standard, a court "defer[s] to the [lower] court's credibility determinations, but . . . review[s] . . . the constitutionally relevant facts ' "de novo, independently of any previous determinations by the [lower court]" ' [citations] to determine whether [the statement] was . . . entitled to no First Amendment protection." (See *ibid.*)

Niblett makes no effort to show a First Amendment violation under the principles set forth in *In re George T.* Niblett does not assert, let alone demonstrate, that he raises a "plausible First Amendment defense" for the purposes of *In re George T.* Furthermore, Niblett does not argue that if we were to conduct

26

an independent review of the testimony credited by the trial court, we would find the evidence fell short of establishing " 'a reasonable person would [have] foresee[n] that [Niblett's statement to Hughes] would be interpreted as a serious expression of intention to inflict bodily harm.' [Citation.]" (See *Garbett*, *supra*, 190 Cal.App.4th at p. 539 [defining true threats].) Accordingly, Niblett's passing reference to *In re George T.* does not resuscitate his First Amendment claim.[16]

## D.     Niblett Forfeits His Contention the WVRO Violates Section 527.3

In his opening brief, Niblett contends, "The WVRO issued against Niblett . . . suppress[ed] his protected labor speech in contravention of . . . section 527.3." In particular, Niblett argues his "October 11[, 2022] statement to Hughes" "fall[s] squarely within the scope of protected labor advocacy under section 527.3" because he "made [the statement] in his capacity as a union representative advocating for systemic workplace improvements."

As the County notes, although "[s]ection 527.3 sets forth certain union or labor activities that [cannot] . . . be[ ]

---

[16] (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 162 [holding that an appellant forfeited an argument by citing an authority without " 'explain[ing] how it applie[d] in [that] case' "]; *Cruz v. Tapestry, Inc.* (2025) 113 Cal.App.5th 943, 953–954 (*Cruz*) [" ' "Even when our review on appeal 'is de novo, it is limited to issues which have been *adequately* raised and supported in [the appellant's opening] brief[,]' " ' " italics added, first set of brackets in original].)

enjoined,"[17] "Niblett fail[s] to quote" section 527.3 in his opening brief and instead "addresses that [s]ection generally, and without any specifics" or analysis vis-à-vis "how the trial court's restraining order violates [s]ection 527.3." The County maintains Niblett "forfeit[ed] th[is] issue on appeal" by "fail[ing] to present authority or develop [this] argument . . . ."

In his reply, Niblett argues, for the first time, that his October 11, 2022 statement to Hughes "occurred within a labor dispute" for the purposes of section 527.3, subdivision (b)(4)(iii); the WVRO enjoins an activity protected by subdivision (b)(1) of the statute; and "Niblett's speech squarely [falls] within section 527.3's protection" because the statement he made to Hughes serves the legislative purpose specified in subdivision (a) of the statute.

On appeal, our review " ' "is limited to issues which have been adequately raised and supported in [the appellant's opening] brief. [Citations.] . . . ." ' [Citation.]" (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555 (*Golden Door Properties, LLC*), first alteration in

---

[17] (See, e.g., § 527.3, subds. (b) & (b)(1) ["The acts enumerated in this subdivision, whether performed singly or in concert, shall be legal, and no court nor any judge nor judges thereof, shall have jurisdiction to issue any restraining order or preliminary or permanent injunction which, in specific or general terms, prohibits any person or persons, whether singly or in concert, from doing any of the following: [¶] . . . Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace."].)

28

original.)  We agree with the County that Niblett forfeited his claim of error predicated on section 527.3 by failing to develop adequately that contention in his opening brief.  (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 156 [holding that an appellant forfeits a contention by "fail[ing] to adequately support . . . [it] with cogent argument or appropriate legal or factual citations"].)  Furthermore, Niblett cannot salvage this claim of error by offering new arguments supporting it in his reply, given that the County did not have an opportunity to respond to these belatedly raised contentions.  (See *Golden Door Properties, LLC*, at p. 518 [" ' " 'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission.' " ' "].)

## E.    We Reject Niblett's Second Amendment Challenge to the WVRO's Firearm Restriction

As we noted in our Applicable Law and Standard of Review, part A, *ante*, section 527.8, subdivision (s)(1) provides, "A person subject to a protective order issued under this section shall not own, possess, purchase, receive, or attempt to receive a firearm or ammunition while the protective order is in effect." (Stats. 2015, ch. 411, § 2.)  Subdivision (s)(2) in turn states, "The court shall order a person subject to a protective order issued under this section to relinquish any firearms he or she owns or possesses . . . ."  (Stats 2015, ch. 11, § 2.)  In accordance with these provisions, the WVRO prohibits Niblett from possessing firearms, firearm parts, and ammunition, and requires Niblett, insofar as he has "not already done so," to turn in to law

29

enforcement, or sell to or store with a licensed gun dealer, any firearms or firearm parts in his possession.

Niblett argues, "Even if the WVRO is upheld, the firearm restriction [included in the order] violates Niblett's Second Amendment rights because the trial court did not conduct the constitutionally required analysis before imposing it." (Boldface omitted.) He contends that the United States Supreme Court's decision in *United States v. Rahimi* (2024) 602 U.S. 680 required the trial court to undertake the following analysis before it could include the firearm restriction in the order: "[E]valuate the nature of the alleged threat, evidence showing dangerousness, and the proportionality of the restriction to the circumstances."

*Rahimi* held that in assessing a Second Amendment challenge to the constitutionality of a statute that "regulates arms-bearing conduct," "the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.' [Citation.]" (See *Rahimi*, *supra*, 602 U.S. at pp. 684–686, 689, 691.) There, a defendant charged with "one count of possessing a firearm while subject to a domestic violence restraining order, in violation of [title] 18 U.S.C. § 922(g)(8)," had challenged the constitutionality of that statute. (See *Rahimi*, at pp. 688, 693.) The high court held that "Section 922(g)(8) is constitutional as applied to [the defendant]" because (1) an order restraining the defendant "met the requirements of Section 922(g)(8)(C)(i)[, as] it included a finding that [the defendant] represented 'a credible threat to the physical safety' of" a parent of the defendant's child, and (2) "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." (See *Rahimi*, at pp. 686, 688–689, 700–701.)

*Rahimi* does not hold that even if a court finds the statutory requirements for issuance of a restraining order have been satisfied, it must still undertake Niblett's proffered three-pronged test before including a firearm restriction in the restraining order. *Rahimi* instead held that title 18 United States Code section 922(g)(8)(C)(i)'s language "bar[ring] an individual from possessing a firearm if his restraining order includes a finding that he poses 'a credible threat to the physical safety' of a protected person" was sufficiently analogous to certain "founding era" "surety and going armed laws" to survive the defendant's Second Amendment challenge to the statute.[18]

Accordingly, the trial court did not err in failing to undertake the three-part test urged by Niblett that *Rahimi* did not mandate. Furthermore, because Niblett clarifies in his reply brief he is not raising "a facial challenge to the constitutionality of the statutory language" requiring the court to include the firearm restriction in the WVRO, we do not decide whether section 527.8, subdivision (s)'s firearm restriction provisions are, by their terms, " 'consistent with the Nation's historical tradition of firearm regulation.' [Citation.]" (See *Rahimi*, *supra*, 602 U.S. at p. 689.) Insofar as Niblett maintains these provisions are unconstitutional as applied to him, we reject that contention because he does not cogently raise it. (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 156.) For these reasons, Niblett's Second Amendment challenge fails.

---

[18] (See *Rahimi*, *supra*, 602 U.S. at pp. 693, 698–700.) As used in the *Rahimi* opinion, the term " 'going armed' laws" refers to a type of legal "mechanism for punishing those who had menaced others with firearms." (See *id.* at p. 697.)

31

## F. Niblett Forfeits Multiple Arguments Raised in His Reply Brief

Niblett forfeits three appellate claims he levels in his reply brief.

First, Niblett argues the WVRO must be reversed because "the 'record as a whole' does not contain 'substantial evidence from which a reasonable fact finder could have found it highly probable,' [citation], that Niblett will in the future threaten Hughes, [Samuel] (or any other County employee) within the meaning of section 527.8," and the trial court did not make any such finding. (Boldface omitted.) The only point at which Niblett mentions this issue in his opening brief is a single sentence in the factual and procedural background section in which he states, "[T]he trial court made no findings on whether Niblett had engaged in a course of conduct as defined under . . . section 527.8 or whether there was reasonable probability unlawful violence [*sic*] in the future."

Second, Niblett argues in his reply we should review his evidentiary challenge to the WVRO de novo because his October 11, 2022 statement to Hughes regarding the shooting at Station 81 "raises a mixed question of law and fact as to whether the trial court properly applied the standards for issuing" the order. Although Niblett suggests in his opening brief we should review independently his First Amendment claim (see Discussion, part C, *ante*), he does not argue in that brief we must review his sufficiency of the evidence claim de novo. In fact, Niblett states in his opening brief, "The Court should review a WVRO issued under . . . section 527.8 for substantial evidence, resolving all factual conflicts for the prevailing party, and

drawing all reasonable inferences supporting the trial court's findings."

Third, Niblett contends in his reply, "Workplace criticism, even when strongly worded, remains protected [by the First Amendment] absent evidence of intent to threaten." Inasmuch as Niblett is claiming in his reply that an essential element of an unprotected "true threat" is the subjective intent to threaten someone, he is raising a new argument that is absent from his opening brief.

By alluding vaguely in the factual and procedural background section of his opening brief to the first issue regarding the trial court's failure to find a likelihood of future harm and waiting until his reply to provide belated analysis and case citations in support of it, Niblett forfeited that claim of error. (See *Cruz*, *supra*, 113 Cal.App.5th at pp. 953–954 [holding that " ' "our review on appeal . . . 'is limited to issues which have been *adequately* raised and supported in [the appellant's *opening*] brief[,]' " ' " italics added, first set of brackets in original]; *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 725–726 [indicating that an issue not raised in the argument section of an appellate brief is subject to forfeiture]; *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 146 [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].) Niblett forfeited the other two appellate claims by asserting them for the first time in his reply. (See *Golden Door Properties, LLC*, *supra*, 50 Cal.App.5th at pp. 482, 518 [concluding that an appellant "forfeited [a] point" "[b]y not raising [it] in [the] opening brief"].)

### G. It Appears Niblett's Appellate Counsel Misused Artificial Intelligence In Misciting Several Cases, Including At Least One that Does Not Exist

On appeal, the County points out that in the opening brief, Niblett's appellate counsel, Robert W. Lucas, cites an alleged case designated as *"Montebello Unified School District v. State Board of Education* (1991) 226 Cal.App.3d 1685."  The County states, "[E]ither the citation is inaccurate or the case is fictitious.  The latter appears to be the case since the [County] could not locate any case by that name in any database."  The County also claims that in the opening brief, Attorney Lucas misrepresented the facts or holdings of several case authorities.

For instance, Attorney Lucas represents that in *Rahimi*, "the [United States Supreme] Court invalidated a federal statute that prohibited firearm possession by individuals subject to certain restraining orders because it lacked a historical basis and did not adequately link disarmament to evidence of dangerousness."  Not so.  As the County correctly observes, the *Rahimi* court "reversed the judgment of the Fifth Circuit Court of Appeals and upheld the statute."  (Citing *Rahimi*, *supra*, 602 U.S. at pp. 700–702.)

Other examples of miscited case authority in the opening brief the County correctly identifies are:  (1) Attorney Lucas's false assertion an excerpt from the *Scripps Health* decision establishes that a statement must threaten immediate harm in order to constitute a credible threat of violence; and (2) counsel's citation to *"R.D. v. P.M.* (2021) 68 Cal.App.5th 1012," which is a case that does not exist, but even assuming counsel intended to refer to a case with that name issued in 2011, that decision did not hold that intent to harm is an element of the statutory

34

definition of a credible threat of violence.  (See Discussion, part B.1, *ante* [discussing these errors in Niblett's opening brief].)

After the County filed its respondent's brief, Attorney Lucas filed a notice of errata to the opening brief.  In the notice, Attorney Lucas deletes from page 32 of the opening brief citations to "*Montebello Unified School District v. State Board of Education* (1991) 226 Cal.App.3d 1685" and "*People v. Zermeno* (1999) 21 Cal.4th 927."  In so doing, counsel concedes "the County is correct" that the *Montebello Unified School District* case "does not appear to exist . . . ."

In the notice of errata, Attorney Lucas asserts he "has no recollection of how the false citation [to the fictional *Montebello* decision] came to be included in the brief, [and] he can only conclude that it was added by the artificial intelligence editing which [he] did not catch before filing."  Attorney Lucas "recognizes that he made a false statement of law to the Court," but he claims he "did not do so knowingly."  Counsel states he filed the notice of errata to "correct[ ] that false statement of law . . . ."  Attorney Lucas further claims "he did not use artificial intelligence to prepare the Appellant's Reply Brief . . . ."

Attorney Lucas does not explain in the notice of errata why he also deleted the *Zermeno* case from his opening brief.  We have reviewed *Zermeno* and conclude it does not remotely stand for the principles for which he cited it.  In his opening brief, Attorney Lucas claimed *Zermeno* supports the following propositions: "Section 527.3 specifically limits the use of injunctions to interfere with lawful efforts by employees to address workplace grievances," and "[e]ven strongly worded or contentious expressions addressing workplace concerns are protected unless they cross the threshold into true threats or violence."  *Zermeno*,

35

however, involved a criminal defendant's challenge to the sufficiency of the evidence supporting a gang enhancement imposed under Penal Code section 186.22. (See *Zermeno*, *supra*, 21 Cal.4th at pp. 928–929, 933 & fn. 3.)

Attorney Lucas does not address the other misrepresentations identified in the County's brief, including Lucas's representation that *Rahimi* invalidated a federal statute when *Rahimi* contains no such holding, and his false assertions concerning *Scripps Health* and "*R.D. v. P.M.* (2021) 68 Cal.App.5th 1012." Additionally, Attorney Lucas asserts in the opening brief that on page 1143 of *Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, "the court reversed a restraining order where the petitioner's subjective fears were unsupported by evidence of immediate or intentional harm." *Bookout* ends at page 1142, and the County correctly points out that the Court of Appeal in that case actually *affirmed* the restraining order before it. (See *Bookout*, at pp. 1134, 1142.)

It thus appears Attorney Lucas used artificial intelligence to prepare the opening brief, filed the brief without verifying the accuracy of the case authority it discusses, and failed to correct his miscitation of cases appearing in the opening brief despite the County's appellate brief noting these errors. Attorney Lucas's behavior is troubling and presents potential ethical issues we cannot ignore. (See *People v. Alvarez* (2025) 114 Cal.App.5th 1115, 1119–1120 [holding that "attorneys must check every citation to make sure the case[s they cite] exist[ ] and the citations are correct," and that failure to do so may warrant imposition of sanctions].) It is also presumptuous to assume he would not be "caught"; Attorney Lucas apparently believes we do not read cases cited in briefs. More disturbing is his apparent

36

disregard of his duties as an officer of the court. Our legal system depends on the integrity of counsel and the bench. Citing nonexistent authority or misciting holdings of cases tarnishes the integrity of the process.

For these reasons, we will order Attorney Lucas to show cause why sanctions should not be imposed on him for his misuse of artificial intelligence in briefing this appeal. The order to show cause is issued concurrently with this opinion.

## DISPOSITION

We affirm the workplace violence restraining order issued on January 18, 2023. Plaintiff and respondent County of Los Angeles is awarded its costs on appeal.

BENDIX, Acting P. J.

We concur:

WEINGART, J.

M. KIM, J.

Filed 11/26/25

**CERTIFIED FOR PARTIAL PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| COUNTY OF LOS ANGELES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NEILL FRANCIS NIBLETT,<br><br>    Defendant and Appellant. | B327744<br><br>(Los Angeles County<br>Super. Ct. No. 22AVRO01811)<br><br>CERTIFICATION AND ORDER FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on October 31, 2025, was not certified for publication in the Official Reports.  For good cause, we publish the opinion in the Official Reports, with the exception of the following:

1.    The last full paragraph of the Introduction, which appears on page 4 of the slip opinion;

2.    The penultimate sentence of the introductory portion of the Discussion, which appears on page 10 of the

slip opinion and starts with the phrase, "In our Discussion, part G, *post*";

3. The text of the heading for part G of our Discussion, which appears on page 34 of the slip opinion and starts with the phrase "It Appears . . . ."; and

4. Part G of our Discussion, which starts on page 34 of the slip opinion and ends on (and includes) the first full paragraph on page 37 of the slip opinion that appears just before the Disposition."

CERTIFIED FOR PARTIAL PUBLICATION.

_____
BENDIX, Acting P. J.        WEINGART, J.        M. KIM, J.